**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**vs.**                                                    **Docket No: 11 CR 1032/PAE**

**MIGUEL STRONG,**

      **Defendant.**

_____/

**SENTENCING MEMORANDUM**

Mr. Miguel Strong is a twenty-five year old man who suffers from severe mental disabilities.  Examination of Mr. Strong's background not only establishes a tangible basis for his cognitive impairment, but also demonstrates that from the outset observers - whether family, friends, academic, or otherwise – have recognized his significant limitations, and the problems that he was likely to encounter, but have either lacked or failed to apply the personal or systemic resources in assisting Mr. Strong in integrating into society in a fully law-abiding and/or productive manner.  Mr. Strong' brief life has been a life of rejection, insecurity, and trauma which has bought Mr. Strong before this Honorable Court today.

His conduct in this matter consists of agreeing to be the driver for his friends who wanted to commit a robbery to settle a drug debt.  Mr. Strong was asked by his friends mostly because he had access to his brothers' vehicle because he 'hustled' as a taxi drivers at malls and shopping centers.  Given these circumstances, a sentence significantly less than the advisory guideline range of 292 to 365 months and/or probations' recommended sentence of 240 months would be

"sufficient, but not greater than necessary" to fulfill the goals of sentencing established by Congress. 18 U.S.C. § 3553(a).

*Mr. Strong's History of Mental Illness*

Mr. Strong's young life has been marked by adversity, struggle, and no one ever helping to teach him the skills that would enable him to overcome his significant limitations.   The third child born to Maxima Strong, a Dominican immigrant living in Washington Heights, Mr. Strong never knew his father.   Mr. Strong's father was reportedly arrested on drug charges and fled to Puerto Rico shortly after Mr. Strong's birth, and never returned.

By the time Mr. Strong's mother was pregnant with him, she was a single-mother of two, and was struggling to maintain a living in the United States working primarily as a hotel maid.   Like many immigrants, but especially with undocumented immigrants, Ms. Strong did not receive prenatal  care while she was pregnant with Miguel.

While visiting her hometown in the Dominican Republic, in approximately her eighth month of pregnancy with Miguel, Ms. Strong fell while exiting her bathtub and went into premature labor. Although doctors at the small town clinic tried to stop the contractions, an emergency delivery was unavoidable.

According to accounts provided to the defense, Mr. Strong weighed approximately three pounds when he was born, clearly underdeveloped for an eight-month fetus.   He remained in the hospital for only a few days before being released in the care of his mother who, however, was forced to leave the Dominican Republic a few days later due to processing of her residency papers in the United States.   As a result, Mr. Strong was left

2

behind in the care of his maternal grandmother, Felicia Liranzo.

Ms. Liranzo and her husband, Efriain Sanchez, lived in the small town of San Francisco de Marcoris (where she remains).   Originally a poor farming region, San Francisco de Marcoris was a town plagued by political unrest in the 1960's and 1970's, as tensions in the capital (Santo Domingo) caused substantial northern migration within the Dominican Republic. The violence and unrest gave way to a financial boom in the 1980's fueled primarily by illicit drug proceeds – so much so that by the early 1990's, San Francisco de Marcoris gained notoriety as the birthplace of many of the most notorious Dominican drug traffickers based in the United States.

Ms. Liranzo, currently 77 years old, had moved to San Francisco de Marcoris from Salcedo in 1948, when she was twelve years old.   In 1963, when the city began giving plots of land to families for free, Felicia and her husband were able to settle down and build a small wooden home. The couple lived together for nearly 48 years, and had five children.   Mr. Sanchez worked mainly as a mechanic in town while Ms. Liranzo tended to the family home.

Mr. Strong lived until age 10 in San Francisco de Marcoris with his grandparents, uncle, two aunts and cousins.   Located in an extremely poor section of town, their house lacked running water, indoor plumbing and, at times, electricity (some of which deprivations still existed when the defense visited in 2013).   According to family members, it was common for the local city government to cut off the neighborhood's supply of water and electricity.   That would often lead to resident protests that were at times violent in nature. The house had no refrigeration or working kitchen appliances.   The family used a hole in

the ground for a toilet, and sewage had to be carried out by wheelbarrow.   The family had a backyard well to store water collected from family members or neighbors.

The family was extremely poor and supported primarily by family members who had already immigrated to the United States, such as Mr. Strong's mother and aunt.   Premature and underweight, Mr. Strong was kept isolated -reportedly for his well-being – in a dark room.   No one was allowed to touch him and he was only picked up to be fed, which his grandmother did by holding his tongue down and dropping milk into his mouth.

According to Mr. Strong's grandmother, it was doubtful he would survive more than a few weeks.   Over time, however, he grew stronger and began to develop, although that development was extremely delayed compared to other children.   For instance, he did not begin walking until he was two years old, and did not begin talking until sometime after that.

As a result of his frailty, Mr. Strong's grandparents, in particular his grandfather, were extremely protective of him.   For example, he slept in his grandparents' bed the entire time he lived with them in the Dominican Republic.   Often, Mr. Strong's grandfather, not wanting Mr. Strong to be out of his sight, would take Mr. Strong to work with him.

According to Mr. Strong's grandmother, Ms. Liranzo, she and her husband believed Mr. Strong needed the extra attention because he was "retarded" and "had problems."   Ms. Liranzo reported that when Mr. Strong was younger, she took him to a psychiatrist for "pills to help calm him down."   Mr. Strong reportedly was easily confused, fighting with children in the neighborhood, and not understanding tasks he was told to perform or behavior he supposed to control.

4

Throughout, Mr. Strong shared a close relationship with his grandfather, M r . E f r a i n  S a n c h e z .   Mr. Strong looked up to him as the only father figure he had ever known.   As a result, Mr. Strong, more so then any of the other grandchildren according to family members, was particularly devastated by his grandfather's death in 1998.   Mr. Sanchez had developed emphysema and died in the family home when Mr. Strong was approximately eight years old. According to Mr. Strong's grandmother, he cried for weeks after Efriain's passing and never fully recovered from the loss.

Although surrounded by family in the Dominican Republic, Mr. Strong always yearned to be reunited with his mother, who was living in New York.   When Mr. Strong was ten years old, his mother was able to secure residency papers for him, and sent for him to join her and his siblings in New York.     Mr. Strong had extreme difficulty assimilating American culture, as it was a stark contrast from the life he had been living in the Dominican Republic.     He did not speak the language and knew few people other than his immediate family.     His brother, who had immigrated a few years before Mr. Strong, distanced himself from Mr. Strong and often teased him about being stupid or slow. His mother's new husband, Ernesto, with whom Mr. Strong was looking forward to starting a relationship, was arrested and subsequently incarcerated on drug charges a few days after Mr. Strong arrived in New York.

In that environment, Mr. Strong unsurprisingly continued to find life in New York difficult.   He struggled with the cultural and linguistic challenges, and did not find solace at school, where he was constantly embarrassed by his lack of academic ability.   His brother, with whom he had once shared a close relationship, now ridiculed him and belittled him in

front of other people calling him "stupid" and "dumb."   For example, Dr. Shea reports that Mr. Strong was rejected by girls he invited on dates because his brother told them Mr. Strong was "stupid."   As a result, according to Dr. Shea, Mr. Strong's "social advances and attempts at dating were often met with rejection and because he was considered stupid and lacking in competent social and linguistic skills."   These issues also led to other problems. Once, a female student accused Mr. Strong of bothering her.   Her boyfriend, much bigger than Miguel at the time, confronted Miguel and a fight ensued.   Miguel was hit in the head and sustained a concussion.

Also, Mr. Strong's mother, working many hours to support the family, often failed to provide Mr. Strong with emotional support.   According to Mr. Strong, she called him "mongolico" (mongoloid) and often remarked that he drove her crazy.   As a result of this emotional stress, Mr. Strong was often depressed.

As professionals in the New York City education system predicted, *see* **post,** at 14, this constellation of issues made Mr. Strong a ripe recruit for gang membership that could afford him a sense of self-worth and social acceptance.   Indeed, Mr. Strong told Dr. Shea that he "entered the gang because [he] didn't have love at home.   I was always criticized, told I was stupid, no one told me I was good [valuable], the only place I found that was with the guys in the gang."

In fact, Dr. Shea observed that Mr. Strong's significant cognitive limitations, "coupled with his diminished sense of self, fostered by his failure in school, bullying by his fellow students, and the withering criticism rendered by his mother and those family members closest to him led him to seek a sanctuary where others would value him for who

and what he was and not 'put him down' for his inadequacies."

Inevitably, Mr. Strong found that sense of belonging "in gang life but he lacked the capacity to understand the consequences of what participation in that life could demand." Moreover, as Dr. Shea, remarked, Mr. Strong served as "an easy target for those who wished to take advantage of his limited intellectual capacity to understand the long-term consequences of his actions."

Consequently, Mr. Strong's gravitating toward gang membership was not tempered by the ordinary cognitive and emotional capacity to make proper judgments.  As Dr. Shea concluded, Mr. Strong's "capacity to evaluate the true value of such social friendships, however, was negatively impacted by his limited cognitive capacity, his poor understanding of consequences, and his emotional immaturity marked by impulsivity and misplaced trust. These combined to make him vulnerable to manipulation by those who understood his fragility and who could use such to advance their own nefarious goals."

### 2.    *Mr. Strong's Educational History*

According to Ms. Liranzo, Mr. Strong's maternal grandmother, his learning and emotional difficulties were evident by the time he began primary school.   Shortly after the school year commenced, Mr. Strong was removed from the class on account of his inability to follow basic instructions and to engage appropriately with other children.

The following year, Mr. Strong enrolled in a different primary school, yet despite being a full year older than his classmates, he was still exhibiting tremendous difficulty with rudimentary concepts *(e.g.,* letters, numbers, colors, etc.) and often acted out in frustration in class. When it became apparent that Mr. Strong was not

able to function on the same level of his (younger) classmates, he was again

removed from the school setting and did not attend for the remainder of the academic

year.

      Nevertheless, Mr. Strong's grandmother tried once more to get Mr. Strong into school.

With family assistance, she enrolled him in a private school not far from their home in San

Francisco de Marcoris.   Again, teachers became keenly aware of his social and cognitive

limitations and reached the conclusion that their school was the not the appropriate setting

for a child with Mr. Strong's special needs.   Consequently, Mr. Strong left school and did

not return until he arrived in the United States at age ten.

      Mr. Strong entered the New York City school system in Fall 2000 at I.S. 52 in

Manhattan.   Based on his age (ten), he was placed in the sixth grade irrespective of his

never having attended a full year of school in the Dominican Republic.

      Not surprisingly, Mr. Strong failed that first school year in New York, and was

retained in the sixth grade for the following (2001-2002) academic year.   Teachers

explained to his mother that he could not be promoted because he was "too delayed."

      Mr. Strong was first referred to the New York City Board of Education's Committee

on Special Education May 16, 2002, due to "extremely underdeveloped academic skills,

minimal learning achievement, lack of motivation in all class activities and behavioral

problems."   The referral form noted that Mr. Strong's language assessment scores in

Spanish were in the second percentile.   It further noted he was exhibiting behavioral

problems in the classroom, and struggling in nearly every academic aspect.

      After two years in the Horizons Program, a bilingual program designed for

recently arrived foreign students, the only progress he had demonstrated was learning the alphabet in Spanish toward the end of his second year.   Psychological and intelligence testing performed June 21, 2002, as part of the special education referral established that Mr. Strong was functioning within the low boundaries of the Slow Learner range of cognitive abilities.   It was also noted that he had "severe academic delays and major problems responding to the demands of the school general education settings[,]" and recognized that once in high school, Mr. Strong would be "at risk of becoming truant and finding some other social outlets."  In fact, inexorably, as events unfolded, that is what occurred.

By May 2003, teachers concluded that Mr. Strong required a more structured special education program, and recommended that he be evaluated for a change in services – specifically, that Mr. Strong be placed in a class of smaller size, and receive the benefit of a paraprofessional assigned solely to him for a portion of the school day.   A subsequent educational evaluation concluded that Mr. Strong's oral receptive and expressive language skills were not age appropriate.   He was found to have significant delays in reading [level of < k (kindergarten)] and reading comprehension.   He demonstrated difficulty writing single words in both Spanish and English.   In math, his performance was determined to be at the 1.8 grade level.   Throughout the entire evaluation it was noted that he appeared not to understand what was being asked of him, and needed much repetition.   An Individual Education Program (IEP) developed June 16, 2003 recommended that Mr. Strong be kept in a special class in a community school, and that he receive both group and individual counseling to address his emotional disturbance.   Based on that

recommendation, he was transferred December 11, 2003, to P.S. 37 Multiple Intelligence School.

Fourteen years old at that point, Mr. Strong continued to struggle academically. An additional evaluation was performed January 3, 2004, to determine his need for speech and language services.   Although Mr. Strong showed strengths in his ability to follow simple oral commands, he demonstrated poor memory skills and was unable to follow multiple directives without prompts and repetitions.   His vocabulary skills were limited and he still could not read or write.   It was recommended that Mr. Strong receive bilingual speech and language therapy twice a week in addition to the counseling and special education services already in place.

Nonetheless, despite severe academic delays, Mr. Strong was promoted to high school the following fall and entered John F. Kennedy High School in the Bronx.   In 2004, Kennedy High School had a reputation for violence, and was repeatedly on the list of schools deemed "persistently dangerous" by the Board of Education.   With an enrollment of approximately 5,000 students, Kennedy was one of the New York City's largest schools and according to reports, had acquired a reputation for poor performance, gangs, drugs, and guns. As a February 4, 2004 *New York Times* article described Kennedy High School as a school that had turned out more horrifying tales than success stories:

> [t]here was the substitute teacher whose hair was set on fire, the
> assistant principal hospitalized after being knocked down by
> students, the assorted objects -trash cans, ceramics projects hurled
> from window, sometimes into teachers' parked cars.   In 2002, during
> summer school a student fatally stabbed another outside the school.

*See* "Metal Detectors and Pep Rallies: Revival of a Bronx High School," *The New   York Times,*

10

February 4, 2004.

Two years after enrolling at Kennedy, Mr. Strong was still in the ninth grade.   An October 6, 2006, Social History Update Report remarked that Mr. Strong still could not read or write.   His behavior was still described as problematic "whereas he has associated himself with the wrong crowd."   A Psychoeducational Evaluation, also dated October 6, 2006, noted that this full scale IQ was "extremely low."   Mr. Strong was described as a young man who appeared quite aware of his limitations, and who experienced significant anxiety and frustration over his inability to meet the demands of his educational environment.

It was recommended that Mr. Strong be placed in a special class within District 75, the citywide program that provides educational, vocational, and behavior support programs for students who are on the autism spectrum, have significant cognitive delays, are severely emotionally challenged, sensorily impaired, and/or suffer from multiple disabilities. Unable to handle even that reduced academic rigor, Mr. Strong ultimately dropped out of high school the following year, 2007, at age 17.

After dropping out of school in 2007, Mr. Strong struggled to live independently. Until a few months prior to his arrest for the instant offense, Mr. Strong lived with his mother, brother and younger sister.   He worked as an unlicensed gypsy cab driver in the Bronx, renting the car from another driver in the Bronx.   Although Mr. Strong had been driving since he was a teenager, he failed his driver's license test three times before passing. He was ultimately able to pass only by taking the exam orally in Spanish, as he could not read or write.

Often, Mr. Strong would wait for fares at the Target shopping center in the South Bronx.   Mr. Strong always charged a flat rate and always asked for exact change because he could neither calculate variable rates (based on different distances) or make change.   Often his passengers would direct him to their location, and as long as he could get back to a major highway he could return to Target.   Mr. Strong was unable to use maps or follow multiple-step directions.   He worked best in the neighborhoods with which he was most familiar.

Regarding other functional aspects of Mr. Strong's life, his mother, sister or girlfriend handled his financial affairs, including banking. For example, Mr. Strong accumulated 27 traffic violations, which cost his mother (who paid them) a total of $10,000 to resolve.   Also, Mr. Strong's mother obtained a debit card for him by filling out the application herself and signing it. She also received his government checks and paid his bills. Mr. Strong had to rely on others for general housekeeping tasks *(e.g.,* laundry, operating major appliances, etc.).

According to his girlfriend, Kenya, with whom Mr. Strong was living shortly before his arrest (and with whom he has a two-year old daughter, and a step-child from Kenya's previous relationship), she was aware that he still could not read or write by age 20 (and that he still cannot).   He lived a somewhat isolated life and did not have many friends of whom she was aware.   He spent most of his time at home or driving his livery car.

After his arrest in this matter, and in preparation for a mitigation submission on his behalf to the U.S. Dept. of Justice, Dr. Shea, a defense psychologist, conducted a psychological examination of Mr. Strong. Ex. 1.   After conducting his examination, Dr. Shea concluded that

12

Mr. Strong's testing results depict a young man of severely limited intellectual ability and clear learning disabilities with no particular intellectual strengths.

Mr. Strong was found to be, for all practical purposes, illiterate and mildly mentally retarded. Interpersonal development and social adeptness were below his age level and these, coupled with his deficient intellectual ability, could have made him vulnerable to manipulation by others.

### The Offense

Mr. Strong has been in either state or federal custody for more than two years, having been initially arrested by the Tallahassee Police Department on September 16, 2011. PSR ¶ 46. The offenses for which he is being sentenced preceded that arrest, covering a time period between June 30, 2011, and August 11, 2011. In that there were six separate sales that totaled 1.13 grams of crack cocaine, PSR ¶ 16, each sale averaged less than two tenths of a gram. There was nothing complicated about catching Mr. Strong. The undercover officers simply drove to areas where they knew street-level dealers were selling small amounts of cocaine and they, dependably, found Mr. Strong.

### Criminal History and Guidelines Range

Mr. Strong' guideline range is as high as it is because of his pleading guilty for the murder of Mr. Avila-Gomez based on conspiratorial conduct. His other predicate acts consist of assaults that did not include the use of a deadly weapon. Mr. Strong does not have a significant criminal history, and what little criminal history he may have, then, too, Mr. Strong' mental illness surely played a role in his criminal history. There are two disorderly conduct convictions, violations not

crimes, in 2009 and 2010.   PSR ¶¶ 134, 135.   Other than the conduct in which he has already

plead guilty for, Mr. Strong does not have a history of violence.

<em>Basis for a Below-Guidelines Sentence</em>

The factors to be considered by a court at sentencing are by now well established. S*ee* 18

U.S.C. § 3553(a); *U. S. v. Regalado*, 518 F.3d 143, 146 (2nd Cir. 2008); also *U. S. v. Cavera*, 550

F.3d 180, 188-189 (2nd Cir. 2008).   In Mr. Strong's case, it is his personal circumstances that

sets his case apart from many others.   As Justice O'Connor recognized in her concurring

opinion in *California v. Brown*, 479 U.S. 538, 545 (1987), "evidence about the defendant's

background and character is relevant because of the belief, long held by this society, that

defendants who commit criminal acts that are attributable to a disadvantaged background, or to

emotional and mental problems, may be less culpable than defendants who have no such

excuse." *See also*, *Porter v. McCollum*, 130 S. Ct. 447, 454 (2009).

According to Mr. Strong' mother and grandmother, his current circumstances are the

product of issues that began to become noticeable when he was a very young boy, about two or

three years old.   To ignore that circumstance and sentence him as a wholly intact person would

be to ignore the longstanding tradition that sentencing courts have of considering the person

before them as an individual.   *See Koon v. U. S.*, 518 U.S. 81, 113 (1996) ("it has been uniform

and constant in the federal judicial tradition for the sentencing judge to consider every convicted

person as an individual and every case as a unique study in the human failings that sometimes

mitigate, sometimes magnify, the crime and the punishment to ensue."); *U.S. v. Broxmeyer*, 699

F. 3d 265, 268 (2nd Cir. 2012) (no limitation shall be placed on the information concerning the

background, character, and conduct of a person convicted of an offense which a court of the

14

United States may receive and consider for the purpose of imposing an appropriate sentence. …). The human failing, here, is Mr. Strong's, but failure also finds a willing partner, that of his family and others who knew that he needed help, and never providing that help to him.   We are left to ponder what the difference it would have made if Mr. Strong was given true help, but we don't have to guess at all to see what not giving him the assistance that was needed has wrought. Mr. Strong asks this Court to consider his mental health issues and his need for treatment and asks the Court to impose a sentence of one hundred and twenty months, so he can return to his family and together they can continue to get him the help that he needs towards becoming a productive member of this society.

*Basis for a Ten Year Sentence Based on the Sentencing Guidelines*

The Sentencing Guidelines recognize that mental and emotional conditions "may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."   USSG § 5H1.3.   Given the magnitude of Mr. Strong' mental health difficulties, it is a condition that is "present to an unusual degree" and that "distinguish[es] this case from the typical cases covered by the guidelines."

The harder question is whether he would also qualify for a downward departure on the basis of USSG § 5K2.13. That provision requires that "the defendant committed the offense while suffering from a significantly reduced mental capacity," and that "the significantly reduced mental capacity contributed substantially to the commission of the offense."   Then, too, the court may not depart if "the defendant's criminal history indicates a need to incarcerate the defendant to protect the public."   It isn't possibly to determine just how much Mr. Strong may have been

15

impacted by his mental disabilities when he agreed to participate in the robbery scheme.   It is difficult to see, though, how his limited intellect and his long standing mental health disabilities , could not have affected his judgment.   Surely, the two conditions have affected his opportunities in life for employment and his life style to such an extent that becoming a part of a street gang and committing crimes on their behalf was an attractive option for Mr. Strong.   As for the argument that Mr. Strong must be incarcerated to protect the public, Mr. Strong acknowledges that some of his limited criminal history may give rise to that argument.   Nonetheless, Mr. Strong's strong family support, his embrace of fatherhood, and a strong desire to do more, he has begun to learn how to read Spanish and is understanding and learning English also.   In speaking with Ms. Strong, being supportive of Miguel and helping him with his disabilities is something that she is committed to doing when he returns home.

To the extent that Mr. Strong' limited intellect and mental illness contributed to the offense, a lesser sentence is justified by the recognition that those who commit offenses due to mental illness or deficits of intellect are less culpable:

> Together, the amendments and policy statements [of the Guidelines] reflect the principle that "punishment should be directly related to the personal culpability of the criminal defendant." *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), abrogated on other grounds, *Atkins v. Virginia*, 536 U.S. 304, 307, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). A few "exceptionally" mentally ill defendants may be found incompetent to stand trial or judged not guilty by reason of insanity; however, there also exists a spectrum of mental deficits and diseases that lessen, but do not erase, a person's responsibility for her crimes. See Jennifer S. Bard, Re-Arranging Deck Chairs on the Titanic: Why the Incarceration of Individuals with Serious Mental Illness Violates Public Health, Ethical, and Constitutional Principles and Therefore Cannot Be Made Right by Piecemeal Changes to the Insanity Defense, 5 Hous. J. Health L. & Pol'y 1, 4-5 (2005). "[E]vidence about [a] defendant's background and character is relevant" to the sentencing decision, "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than

16

defendants who have no such excuse." *Penry*, 492 U.S. at 319 (quoting *California v. Brown*, 479 U.S. 538, 545, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987) (O'Connor, J., concurring)).

*U. S. v. Ferguson*, 942 F.Supp.2d 1186, 1192-1193 (M.D. Ala. 2013); see also *U.S. v. Lara*, 905 F.2d 599 (2nd Cir. 1990); and *U.S. v. Rivera*, 192 F.3d 81, 85 (2nd Cir. 1999) (We have held by negative implication that there are indeed certain situations where a person's mental and emotional conditions may be taken into account in granting a downward departure.); and also *U. S. v. Brady*, 417 F.3d 326, 333 (2nd Cir. 2005).

Even if it cannot be said that Mr. Strong' impairments contributed to the offense, the usual rationale for punishment has less meaning when applied to those who are as impaired as Mr. Strong:

> In addition, the traditional rationales for punishment have less force when applied to mentally ill and cognitively limited defendants. *Cantu*, 12 F.3d at 1516; *U. S. v. Poff*, 926 F.2d 588, 595 (7th Cir. 1991) (en banc) (Easterbook, J., dissenting), cert. denied, 502 U.S. 827, 112 S. Ct. 96, 116 L. Ed. 2d 67 (1991). "Desert (blameworthiness) loses some bite because those with reduced ability to reason, or to control their impulses, are less deserving of punishment than those who act of viciousness or greed," *Cantu*, 12 F.3d at 1516; "Deterrence has less value ... because people with reduced capacities are less susceptible to a system of punishment and reward." Id.; see also Bard, Re-Arranging Deck Chairs, 5 Hous. J. Health L. & Pol'y at 12-13. The remaining rationale—incapacitation to protect the public safety— does not justify incarcerating mentally ill, intellectually disabled defendants unless they are violent. *U.S. v. Cantu*, 12 F.3d 1506, 1516 (9th Cir. 1993); USSG §5K2.13.
>
> *Ferguson*, 942 F.Supp.2d at 1192-1193.

There is a growing recognition, too, that prisons are not a solution in the case of those who are mentally ill, that prisons are not the most effective place for treatment, and that both the defendant and the public are better served by treatment alternatives:

The amended guidelines also reflect the growing recognition that treating mentally ill criminal defendants rather than imprisoning them better serves both the defendants and society. See, e.g., *U. S. v. Bannister*, 786 F. Supp. 2d 617, 656-67 (E.D.N.Y. 2011) (Weinstein, J.); Policy Topics: The Criminalization of People with Mental Illness, National Alliance on Mental Illness, http://www.nami.org (last visited February 18, 2013); W. David Ball, Mentally Ill Prisoners in the California Department of Corrections and Rehabilitation: Strategies for Improving Treatment and Reducing Recivisim, 24 J. Contemp. Health L. & Pol'y 1, 34-37 (2007). Prison is not an appropriate setting for mentally ill defendants to receive treatment, as such individuals may be more vulnerable to difficult living conditions and abuse from other prisoners. Human Rights Watch, Ill-Equipped: U.S. Prisons and Offenders with Mental Illness 56, 59 (2003). This is because, "[f]or mentally disordered prisoners, danger lurks everywhere":

> "They tend to have great difficulty coping with the prison code—either they are intimidated by staff into snitching or they are manipulated by other prisoners into doing things that get them into deep trouble.... [M]ale and female mentally disordered prisoners are disproportionately represented among the victims of rape. Many voluntarily isolate themselves in their cells in order to avoid trouble. Prisoners who are clearly psychotic and chronically disturbed are called 'dings' and 'bugs' by other prisoners, and victimized. Their anti-psychotic medications slow their reaction times, which makes them more vulnerable to 'blind-siding,' an attack from the side or from behind by another prisoner."

Id. at 56-57 (quoting Terry Kupers, Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It 20 (1999)).   Providing comprehensive, effective treatment for those mentally ill defendants whose disorder drives their criminality will more likely protect the public from suffering future crime—and that treatment does not come from incarceration.

*Id.* at 1193-94.

Mr. Strong has entered into a plea agreement with the Government that forbids him from requesting any sentencing departures based on the Guidelines.   Mr. Strong understands this clearly and does not in any way imply that this analysis, using the guideline provisions, is a request from Mr. Strong for a departure based on the guidelines.

18

2. 18 U.S.C. 3553(a) and Mr. Strong' age in considering his sentence

The mandate of 18 U.S.C. § 3553(a) is, of course, for the court to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in paragraph 2 of that same statute.   In *Cavera* the court summarized the factors that a sentencing court must consider:

> "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime.   In addition to taking into account the Guidelines range, the district court must form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).   The sentencing judge is directed, moreover, to consider: a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation. *Id.* § 3553(a)(2).   Additionally, district courts must take into account: the kinds of sentences available, *id.* § 3553(a)(3); any pertinent Sentencing Commission policy statement, *id.* § 3553(a)(5); the need to avoid unwarranted sentence disparities among similarly situated defendants, *id.* § 3553(a)(6); and, where applicable, the need to provide restitution to any victims of the offense, *id.* § 3553(a)(7)."

In Mr. Strong' case, it is the "circumstances of the offense and the history and characteristics of the defendant" that justifies a sentence of one hundred and twenty months. Mr. Strong' has, from his arrest until the time of sentencing, done what he could to spare the government much needed expenses and time.   A sentence of two hundred and ninety-two to three hundred and sixty-five months is much more than sufficient and does not satisfy the goals of sentencing.   A sentence of one hundred and twenty months would take in the need to afford adequate deterrence to any further conduct of Mr. Strong and anyone else who would espouse to place themselves in Mr. Strong' position.   Such a sentence would, as well, fulfill the remaining purposes set forth in the statute.

Mr. Strong's age is a consideration here in regards to his sentencing as well.   In a 2005 report from the Office of Juvenile and Delinquency Prevention of the United States Department of Justice, the Department recognized that "the parts of the brain that govern impulse, judgment, and other characteristics may not reach complete maturity until an individual reaches age 21 or 22." *Id.*   at 8.1.   Recently, too, the United States Supreme Court concluded that life sentences for juveniles violate the Eighth Amendment prohibition against cruel and unusual punishment, largely because of the immaturity and greater possibility for change associated with those under eighteen:

> As compared to adults, juveniles have a "lack of maturity and an underdeveloped sense of responsibility"; they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and their characters are "not as well formed." *Id.*, at 569-570, 125 S. Ct. 1183, 161 L. Ed. 2d 1. These salient characteristics mean that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.*, at 573, 125 S. Ct. 1183, 161 L. Ed. 2d 1. Accordingly, "juvenile offenders cannot with reliability be classified among the worst offenders." *Id.*, at 569, 125 S. Ct. 1183, 161 L. Ed. 2d 1. A juvenile is not absolved of responsibility for his actions, but his transgression "is not as morally reprehensible as that of an adult." *Thompson*, *supra*, at 835, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (plurality opinion).   No recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles. As petitioner's amici point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. See Brief for American Medical Association et al. as Amici Curiae 16-24; Brief for American Psychological Association et al. as Amici Curiae 22-27. Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults. *Roper*, 543 U.S., at 570, 125 S. Ct. 1183, 161 L. Ed. 2d 1. It remains true that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Ibid.*

---

[1]The report is available at www.ncjrs.gov/pdffiles1/ojjdp/212757.pdf.

*Graham v. Florida*, 560 U.S. 48, 69 (2010); see also *U.S. v. Johnson*, 2012 U.S. Dist. Lexis

146152 (E.D.N.Y. 2012)

Mr. Strong was a juvenile when he committed the instant offense and the issue, of course,

is not whether he should be sentenced to life imprisonment.   Nonetheless, as recognized by the

Department of Justice, the character and thinking process of even young adults is incomplete and

much of what was said in Graham has meaning here.   Indeed, Mr. Strong's crime shows a

failure to weigh his actions and an impetuous failure to seek a better solution, both traits

commonly associated with immaturity, those traits exaggerated by his mental liabilities.

Mr. Strong's youthful age is included in his "history and characteristics," part of the

statutorily required consideration in the sentencing determination.   18 U.S.C. § 3553(a)(1).

Similarly, his reason for committing the offense is part of "the nature and circumstances of the

offense," the other part of the statutorily required consideration.

There was a time, of course, when district courts were limited in their ability to rely upon

circumstances such as age in arriving at a sentence.   That, though, is no longer the case, and

sentencing courts are required to consider such factors:

> The Commission has not developed any standards or recommendations that affect
> sentencing ranges for many individual characteristics. Matters such as age,
> education, mental or emotional condition, medical condition (including drug or
> alcohol addiction), employment history, lack of guidance as a youth, family ties,
> or military, civic, charitable,   or public service are not ordinarily considered
> under the Guidelines. See United States Sentencing Commission, Guidelines
> Manual 5H1.1-6, 11, and 12 (Nov. 2006).n3.   These are, however, matters that §
> 3553(a) authorizes the sentencing judge to consider. *See, e.g.*, 18 U.S.C. §
> 3553(a)(1).

*Rita v. United States*, 551 U.S. 338, 364-365 (2007) (Stevens, J. concurring). *See also United States v. Jarvi*, 537 F.3d 1256, 1263 (10th Cir. 2008) ("We have now held that district courts have broad discretion to consider individual characteristics like age, employment, and criminal history in fashioning an appropriate sentence under 18 U.S.C. § 3553(a), even when disfavored under the Guidelines or already accounted for in another part of the calculation") and *U. S. v. Bannister*, 786 F.Supp.2d 617 (E.D.N.Y. 2011).

In *Gall v. United States*, 552 U.S. 38 (2007), the court relied on the youth of the twenty-one year old defendant as one of the reasons justifying a below-guideline sentence:

> In summary, the District Judge observed that all of Gall's criminal history "including the present offense, occurred when he was twenty-one-years old or younger" and appeared "to stem from his addictions to drugs and alcohol." *Id.*, at 122-123. The District Judge appended a long footnote to his discussion of Gall's immaturity. The footnote includes an excerpt from our opinion in *Roper v. Simmons*, 543 U.S. 551, 569, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), which quotes a study stating that a lack of maturity and an undeveloped sense of responsibility are qualities that "'often result in impetuous and ill-considered actions.'"   The District Judge clearly stated the relevance of these studies in the opening and closing sentences of the footnote: "Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five. . . . [T]he recent [National Institutes of Health] report confirms that there is no bold line demarcating at what age a person reaches full maturity.   While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant." App. 123, n 2.

*Id.* at 57-58.

Mr. Strong understands that this Court is well aware of the goals of sentencing set forth in 18 U.S.C. § 3553(2)-(7).   Mr. Strong' minor prior criminal history, his age, the circumstance that his crime was largely the product of his immaturity coupled with his mental disabilities, and that as a young man, he has a greater capacity for change, suggests a reduced possibility of

recidivism and are relevant to the need to promote respect for the law.2   Neither Mr. Strong's

calculated guideline range, nor probation' recommended sentence, comports with the

admonishment of 18 USCA 3553 (a) in that a sentence be sufficient but not greater than

necessary to comply with" the goals of sentencing.

This Court, in arriving at the sentencing decision in this case, must, of course, consult the

United States Sentencing Guidelines as the starting point in any sentencing determination. *See*

*U. S. v. Dorvee*, 3023799 WL (2nd Cir. Aug. 4, 2010); *U. S. v. Marrero*, 325 F.Supp.2d 453, 456

(S.D.N.Y. 2004).   Nonetheless, courts must also consider the other factors set out in § 3553(a).

Indeed, in some instances, the guidelines may have little persuasive force in light of some of the

other § 3553(a) factors:

> Although "judges must still consider the sentencing range contained in the
> Guidelines, . . . that range is now nothing more than a suggestion that may or may
> not be persuasive . . . when weighed against the numerous other considerations
> listed in [§ 3553(a) ]." *Id.* at 787 (Stevens, J., dissenting). Indeed, as one district
> judge has already observed;
>
>> the remedial majority in Booker [] direct[s] courts to consider all of
>> the § 3553(a) factors, many of which the guidelines either reject or
>> ignore. For example, under § 3553(a)(1) a sentencing court must
>> consider the "history and characteristics of the defendant." But
>> under the guidelines, courts are generally forbidden to consider the
>> defendant's age, his education and vocational skills, his mental and
>> emotional condition, his physical condition including drug or
>> alcohol dependence, his employment record, his family ties and
>> responsibilities, his socio-economic status, his civic and military
>> contributions, and his lack of guidance as a youth. The guidelines'

---

2 Just, however, as a sentence that is too short may fail to reflect the seriousness of the
offense, promote respect for the law, or provide just punishment, so will a sentence that is
excessively harsh.   *See, e.g.,* United States v. Ontiveros, 07-CR-333, 2008 U.S. Dist. LEXIS
58774, *6 (E.D. Wis. July 24, 2008) ("[A] sentence that is disproportionately long in relation to
the offense is unjust and likewise fails to promote respect [for the law]"); United States v. Zavala,
No. 07-14851, 2008 U.S. App. LEXIS 24168, *8-9 (11th Cir. Nov. 25, 2008) ("[A]ny higher
sentence would promote disrespect for the law.") (quoting the district court).

> prohibition of considering these factors cannot be squared with the
> § 3553(a)(1) requirement that the court evaluate the "history and
> characteristics" of the defendant.

*U. S. v. Ranum*, 353 F. Supp. 2d 984, 986 (E.D.Wis.2005) (citations omitted).

Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all but the most unusual cases are now potentially relevant in every case.  *U. S.   v. Crosby*, 397 F.3d 103, 113 (2nd Cir. 2005). *See also*, *U. S. v. Johnson*, 567 F.3d 40, 47 (2nd Cir. 2009)("post-Booker, the Sentencing Reform Act (SRA) requires the sentencing court to regard the guidelines' ranges as one of the many factors to consider in determining the sentence").   Mr. Strong believes that the guideline sentence set forth in his pre-sentence report by the probation department falls short of "the need to avoid unwarranted sentence disparities among defendants. . . who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

The goals set forth in §3553(a)(2) consist of the "need for the sentence imposed"

> (A) to reflect the seriousness of the offense, to promote respect for the law,
> and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational, training,
> medical care, or other correctional treatment in the most effective manner.

Mr. Strong's guideline sentencing range is hard pressed in meeting these goals.   In this case, though, Mr. Strong, who has never been incarcerated, is facing a sentence of a 24.3 years to 30.4 years in prison, all because of being the driver in a robbery scheme where his co-defendants' actions, the murder of Mr. Avila-Gomez, has helped to place his guidelines where they are today. *See* ¶¶ 171, 172 PSR.   Thus, this court will necessarily be imposing a significant sentence on

someone who has never been involved with the criminal justice system in any significant way.

Mr. Miguel Strong was a teenager, who suffered from severe mental disabilities, when he began committing the offense for which he now stands before this Honorable Court.   He was, at the time, unemployed and living with his mother, in a family environment that was not supportive of him and his disabilities.   Having a minimum criminal justice history, his personal history, and given his age, a sentence of ten years would be "sufficient, but not greater than necessary," to comply with the goals of sentencing. 18 U.S.C. § 3553(a).

### 3. Role of the Advisory Sentencing Guidelines

As recognized in *U. S. v. Capanelli*, 479 F.3d 163, 165 (2nd Cir. 2007) the Second Circuit resolved a continuing debate among the circuits' as to how much weight should be given to one of the listed factors, the Sentencing Guidelines.   In the decision in *Capanelli*, the court rejected "any across-the-board prescription regarding the appropriate deference to give the guidelines." 459 F.3d at 1184.   Rather, "The recommended guideline range "*should* serve as 'a benchmark or a point of reference or departure' " for a sentencing court.   *U.S. v. Fernandez*, 443 F.3d 19, 28 (2nd Cir. 2006)(emphasis added)(quoting *U.S. v. Rubenstein*, 403 F.3d 93, 98-99 (2nd Cir. 2005), cert denied, 546 U.S. 876 (2005).   While a district court must consider each § 3553(a) factor in imposing a sentence, the weight given to any single factor "is a matter firmly committed to the discretion of the sentencing judge and is beyond our review." *Id.* at 32.   As recognized by Judge Tjoflat in *U. S. v. Glover*, 431 F.3d 744, 752-753 (11th Cir. 2005), in some cases the Guidelines may have little persuasive force in light of some of the other § 3553(a) factors:

> Although "judges must still consider the sentencing range contained in the Guidelines, . . . that range is now nothing more than a suggestion that may or may not be persuasive . . . when weighed against the numerous other considerations

listed in [§ 3553(a) ]." *Id.* at 787 (Stevens, J., dissenting).

Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all but the most unusual cases are now potentially relevant in every case.

Then, too, a sentence imposed outside of the Guidelines' scheme does not require extraordinary circumstances:

> "Before *Booker*, we recognized that district courts were required to sentence within the guideline range except in unusual cases, *U. S. v. Johnson*, 347 F.3d 635, 640 (7th Cir. 2003), and anything but a loose comparison to pre-Booker departure cases would vitiate the post-Booker discretion that sentencing courts enjoy.   All that is necessary now to sustain a sentence above the guideline range is "an adequate statement of the judge's reasons, consistent with section 3553(a), for thinking the sentence that he has selected is indeed appropriate for the particular defendant. <u>Dean</u>, 414 F.3d at 729."

*U. S. v. Castro-Juarez*, 425 F.3d 430, 436 (7th Cir. 2005).

"Since *Booker*, [however], the Guidelines are no longer a straight-jacket binding courts to artificially created and cruel paradoxes of sentencing. . ." *United States v. Hawkins*, 380 F. Supp. 2d 143, 161 (E.D.N.Y. 2005).

#### 4. The relationship between the sentence for the current offense and prior time served.

The 2nd Circuit has said that a court should consider the "appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses." *U.S. v. Aguilar*, 2010 U.S. Dist. Lexis 6198 (S.D.N.Y. Nov 16, 2009) (quoting *U.S. v. Mishoe*, 241 F.3d 214, 220 (2nd Cir. 2001).   As observed by this Circuit with respect to the rationale of specific deterrence and the relationship between the sentence for the current offense and prior time served, albeit in the context of career offender criminal history

categories, and the over-representation of criminal history categories, "if a defendant served no time or only a few months…, a sentence of even three to five years for the current offense might be expected to have the requisite deterrent effect. *U.S. v. Castillo*, 2007 U.S. Dist. Lexis 101879 (S.D.N.Y. Jan. 24th, 2007), quoting *Mishoe*, 241 F.3d at 220; see also *U.S. v. Aggrey-Fynn*, 2006 U.S. Dist. Lexis 85694 * 9-10 (S.D.N.Y. November 22, 2006) (District court departed from guideline range of 151 – 188 months and sentenced defendant to 120 months as a first time offender provided an adequate deterrent effect.)

Despite having a few police contact, Mr. Strong has two disorderly conduct convictions, both acquired between the ages of 19 -20 years of age, never spent a day in jail before this case. Mr. Strong is the defendant that the *Mishoe* Court was speaking about, the defendant who has never served any time, where a sentence of even three to five years would be expected to have the requisite deterrent effect.   The guideline sentence called for here is three to four times greater than what the court thought would be appropriate for a first time offender in *Mishoe*. Yet pursuant to the sentencing calculation proposed by the probation department Mr. Strong faces a guideline sentence of 292 months to 365 months.   The recommended sentence by the probation department also fails to satisfy the purposes of sentencing pursuant to 3553(a) in all of the same respects.

*Conclusion*

Sentencing courts are, of course, charged with the responsibility of treating those that come before them as individuals.   *See* <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings

27

that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") Courts

are charged by Congress, as well, to impose a sentence that is sufficient, but not greater than

necessary to fulfill the goals of sentencing established by Congress. *See* 18 U.S.C. § 3553(a).

Mr. Strong respectfully requests this Court to follow that tradition and impose a sentence of 120

months with an appropriate period of supervised release.


                                        Respectfully Submitted,

                                        *s/Kafahni Nkrumah*              ,
                                        KAFAHNI NKRUMAH, Esq.
                                        Counsel for Mr. Strong

                                        Nkrumah Law PLLC
                                        20 Vesey Street, Ste. 400
                                        New York, New York 10007
                                        (917) 722-2430 (o)
                                        (877) 316-9241 (24hr service)
                                        kankruamahesq@aol.com


Cc:   by ECF
Ms. Nola B. Heller
Ms. Jessica Ortiz