F2PKSTRS                         Sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        11 CR 1032 (PAE)

5    MIGUEL STRONG,

6              Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         February 25, 2015
9                                        10:40 a.m.

10

     Before:
11
                    HON. PAUL A. ENGELMAYER,
12
                                         District Judge
13

14                         APPEARANCES

15

     PREET BHARARA,
16        United States Attorney for the
          Southern District of New York
17   MICAH WJ SMITH
     RACHEL MAIMIN
18        Assistant United States Attorney

19   KAFAHNI NKRUMAH
          Attorney for Defendant
20

21   ALSO PRESENT:

22   ANNA MARIA RISO, Spanish Interpreter
     ERIKA DE LOS RIOS, Spanish Interpreter
23

24

25

F2PKSTRS                        Sentence

 1            THE DEPUTY CLERK:  For sentencing, United States

 2    against Miguel Strong, S5:11 CR 1032.

 3            Government ready?

 4            MR. SMITH:  Yes.  Good morning, your Honor.  Micah

 5    Smith and Rachel Maimin, for the government.

 6            MS. MAIMIN:  Good morning.

 7            THE COURT:  Good morning.

 8            THE DEPUTY CLERK:  Defendant?

 9            MR. NKRUMAH:  Good morning, your Honor.  Kafahni

10    Nkrumah, for Miguel Strong, the defendant, who is at the

11    defense counsel table.

12            THE COURT:  Good morning, Mr. Nkrumah.

13            Good morning to you, Mr. Strong.

14            And I will note for the record --

15            THE DEFENDANT:  Good morning.

16            THE COURT:  -- that Mr. Strong is assisted today by a

17    Spanish-speaking court certified interpreter.

18            As everyone here is aware, the sentencing proceeding

19    in this case was originally scheduled for February the 3rd, and

20    we got going in that proceeding, but stopped fairly early in it

21    when it became apparent to me that there were certain letters

22    written by family members of the defendant that defense counsel

23    had received, but which I had not received, and I wanted to

24    make sure that we had time for those letters to be provided to

25    me.

1              At that conference, I had gotten to the point of

2     reviewing all the other materials that had been submitted in

3     connection with sentencing.  I'm not going to review all of

4     those again.  I'm incorporating by reference the list of those

5     materials, including the presentence report and the parties'

6     various sentencing submissions that I put on the record at the

7     February 3rd conference.

8              Since that conference, though, I have received two

9     things.  I have received a letter from the defendant's younger

10    sister, Escrawlina, and I have received a separate letter from

11    the defendant's older sister, Eswilda.  Let me ask, first of

12    all, to confirm:  Has the defendant received those letters?

13    Has the defense received those letters?

14              MR. NKRUMAH:  Yes, your Honor.  And I would like to

15    add -- I know I'm going ahead, but I would like to add to the

16    Court, there are two other letters, your Honor, that we had

17    received, and I want to explain to the Court what happened --

18              THE COURT:  We'll take that in a moment.

19              Let me just ask the government:  Have you received the

20    two letters that I listed a moment ago?

21              MR. SMITH:  Yes, your Honor.

22              THE COURT:  Have any other materials been submitted

23    since February 3rd in connection with sentencing?  Government,

24    are you aware of any other materials that have been submitted

25    in connection with sentencing?

F2PKSTRS                    Sentence

1          MR. SMITH:  Only the two new letters that I believe

2    defense counsel is about to raise.

3          THE COURT:  Very good.

4          And, Mr. Nkrumah, I take it the entirety of what

5    you're proposing to add to the sentencing record are the two

6    new letters?

7          MR. NKRUMAH:  That is correct, your Honor.

8          THE COURT:  Go ahead, please.  Explain.

9          MR. NKRUMAH:  A brief explanation to the Court.  As I

10   explained to the Court on the last court date, I'm in the

11   process of relocating, and I have relocated, and my relocation

12   occurred halfway across the country.  I'm in Houston, Texas,

13   right now.

14         THE COURT:  Can you just keep your voice up.  I think

15   we're having a little difficulty hearing you.

16         MR. NKRUMAH:  I'm in Houston, Texas, right now.  So

17   the court-appointed interpreter who translated these letters,

18   we received the letters, one is from Ms. Maxima Strong, my

19   client's mother, and one is from Raphael Medina, my client's

20   stepfather.  We received those handwritten letters in Spanish.

21         I, in turn, turned those letters over to Ms. Jan

22   Calloway, a court-certified interpreter -- federal

23   court-certified interpreter here in the Southern District of

24   New York, and she interpreted the letters and FedExed them to

25   me in Houston.  FedEx claimed that they left the letters at my

1    office -- outside the door of my office and never gave it to a

2    person at 4:48 p.m.  We have a tracker on the letters and

3    everything.  FedEx is not able to find the letters, we have

4    been unable to find the letters, but I was able to get the

5    translations from Ms. Calloway, and I would like to provide

6    those translations to the Court for the Court's review.

7              THE COURT:  Okay.  Very good.  In other words, what

8    you're representing to me is that you have a qualified

9    translator who saw the original Spanish language letters and

10   interpreted them, and therefore, although we don't have those

11   original letters, the translations ought to accurately capture

12   what was said in those letters?

13             MR. NKRUMAH:  That is correct, your Honor.

14             THE COURT:  Okay.  Do you, though, now have all --

15   even in that form, you do now have at least a translation of

16   every family letter that you received?

17             MR. NKRUMAH:  Yes, your Honor.

18             THE COURT:  Okay.  Very good.  I'm happy to have them

19   handed up.

20             For the record, counsel has handed up a typed English

21   language translation of a letter from Maxima Medina and a

22   separate typed English language translation of a letter from

23   Raphael Medina.

24             When did you provide these to the government?

25             MR. NKRUMAH:  This morning, your Honor, when they came

F2PKSTRS                          Sentence

1    into the courtroom.

2              THE COURT:  Okay.  Mr. Smith, have you now received

3    these two letters?

4              MR. SMITH:  I have, your Honor, and I have reviewed

5    them as well.

6              THE COURT:  You have had sufficient time to review

7    them?

8              MR. SMITH:  Yes, your Honor.

9              THE COURT:  And, again, just to confirm, Mr. Nkrumah,

10   to make sure there's no doubt, there are no letters at this

11   point that you have in any form received that I have not

12   received an English language version of, correct?

13             MR. NKRUMAH:  Yes, your Honor.

14             THE COURT:  No missing letters?

15             MR. NKRUMAH:  No missing letters.

16             THE COURT:  All right.  I'm going to take a moment and

17   read these.

18             MR. NKRUMAH:  Thank you, your Honor.

19             (Pause)

20             THE COURT:  All right.  Thank you.  I've read the two

21   recently provided letters.

22             Just to be absolutely clear, is either counsel aware

23   of any item that's been submitted in connection with sentencing

24   other than the ones I listed on February 3rd and today?  Have

25   we now completely identified every aspect, every item that is

F2PKSTRS                          Sentence

 1    before the Court for purposes of sentencing?

 2              MR. SMITH:  I believe so, your Honor, yes.

 3              MR. NKRUMAH:  Yes, your Honor.

 4              THE COURT:  All right.  Very good.

 5              Turning, then, to the presentence report.

 6    Mr. Nkrumah, have you read the presentence report?

 7              MR. NKRUMAH:  Yes, I have, your Honor.

 8              THE COURT:  Have you discussed it with your client?

 9              MR. NKRUMAH:  Yes, I have, your Honor.

10              THE COURT:  Mr. Strong, has the presentence report

11    been read to you?

12              THE DEFENDANT:  Yes.

13              THE COURT:  Have you discussed it with Mr. Nkrumah?

14              THE DEFENDANT:  Yes.

15              THE COURT:  Have you had the opportunity to go over

16    with Mr. Nkrumah any errors in the report or anything else that

17    should be taken up with the Court?

18              THE DEFENDANT:  Yes.

19              THE COURT:  Mr. Smith, have you reviewed the

20    presentence report?

21              MR. SMITH:  Yes, your Honor.

22              THE COURT:  Putting aside issues with respect to the

23    sentencing guidelines, does anyone have any objection to the

24    report regarding its factual accuracy?

25              MR. SMITH:  No, your Honor.

F2PKSTRS                          Sentence

1          THE COURT:  Mr. Nkrumah?

2          MR. NKRUMAH:  No, your Honor.

3          THE COURT:  Then hearing no objections, I will adopt

4    the factual recitations set forth in the presentence report.

5    The presentence report will be made a part of the record in

6    this matter.  It will be placed under seal.  In the event an

7    appeal is taken, counsel on appeal may have access to the

8    sealed report without further application to this Court.

9          Have the parties' sentencing submissions, either in

10   whole or in redacted form, been publicly filed?

11         MR. SMITH:  I believe so, your Honor.  I'll

12   double-check today.

13         THE COURT:  Very good.  I'll ask you to do so if you

14   haven't.

15         Mr. Nkrumah?

16         MR. NKRUMAH:  The sentencing memorandum has been

17   publicly filed, your Honor, but the other materials, as the

18   Court is aware, are under seal.

19         THE COURT:  Very good.  Well, I authorize you to file

20   under seal the personally sensitive parts of your sentencing

21   submission.

22         MR. NKRUMAH:  Thank you.

23         THE COURT:  Thank you.

24         The next issue I need to turn to involves the

25   sentencing guidelines.  The Court is, of course, no longer

1    required to follow the sentencing guidelines, but I am required

2    to consider the applicable guideline in imposing sentence.   To

3    do so, it's necessary that the Court accurately calculate the

4    guideline sentencing range.

5          In this case, there was a plea agreement in which the

6    parties stipulated to a particular calculation of the

7    sentencing guidelines.   The presentence report is not in accord

8    with that agreement in one respect.   The parties have

9    stipulated that under sentencing guideline Section 2A1.1A,

10   application note 2(b), which relates to felony murder, a

11   three-level downward departure is warranted because the

12   defendant did not cause the death of David Avila-Gomez

13   knowingly or willfully, but instead is liable under a theory of

14   felony murder.   The presentence report does not adopt that

15   adjustment.

16         I heard the evidence at the relatively recent trials

17   of Felix Lopez-Cabrera, who was a participant in that murder,

18   and of course, the two other defendants.   I'm familiar with the

19   circumstances of the Avila-Gomez murder.   It is clear to me,

20   based on the evidence I heard, that it was a classic felony

21   murder in that there was no preexisting plan among the five men

22   in the car to kill Mr. Avila-Gomez, the plan instead was only

23   to rob him.   There is not a factual basis to believe that

24   Mr. Strong, as the driver of the car, knew that Mr. Avila-Gomez

25   would be shot.   I, therefore, accept the parties' view that the

F2PKSTRS                          Sentence

 1   three-level downward departure applies.  Otherwise the

 2   presentence report's guidelines calculation is accurate and

 3   unobjected to.

 4          Accordingly, based on the parties' agreement, and the

 5   absence of objection, and my own independent evaluation of how

 6   the sentencing guidelines apply here, I accept the guideline

 7   calculation in the presentence report with the addition of the

 8   three-level downward departure pursuant to application note

 9   2(b).

10          The bottom line is that I find that the offense level

11   here is 37, the Criminal History Category is I, and the

12   guideline range is between 210 and 262 months' imprisonment.

13          Does anybody have any objection or correction to that?

14          MR. SMITH:  No, your Honor.

15          MR. NKRUMAH:  No, your Honor.

16          THE COURT:  Okay.  Because the Court's calculations

17   differ from those in the presentence report, I order that the

18   presentence report be amended to reflect that one change I've

19   just made.

20          The next subject I need to take up involves

21   departures, which is to say within the framework of the

22   sentencing guidelines.  In the plea agreement, both parties

23   agreed that with the exception of the departure ground just

24   addressed, neither an upward, nor a downward departure, again

25   within the guidelines framework, is merited.  Having reviewed

F2PKSTRS                          Sentence

1    the presentence report and the parties' submissions, I'm not

2    certain by any means that as a technical legal matter, that is

3    correct.  It is clear to me that Mr. Strong has very

4    considerable deficiencies in his mental functioning.  The

5    materials submitted to me show demonstrated evidence of that,

6    including Dr. Shea's persuasive report, which in turn is

7    corroborated by the findings of the Social Security

8    Administration.

9        It seems to me that Mr. Strong's compromised mental

10   faculties might well support a downward departure under Section

11   5H1.3, where mental health difficulties are presented to an

12   unusual degree and distinguish the defendant's case from the

13   typical cases under the guidelines.  However, my judgment is

14   that it's not necessary to determine within the constricting

15   framework of the guidelines whether or not the facts here rise

16   to the level of meeting the Section 5H1.3 standard.  That's

17   because the guidelines are advisory, and under the Section

18   3553(a) factors, I can fully take account of Mr. Strong's

19   mental health difficulties, which I do regard as mitigating.

20       Section 3553(a) allows me to achieve, in effect, the

21   same outcome as I could and would achieve had a downward

22   departure on these grounds been available as a matter of law

23   and had I elected to use that as a basis to impose a

24   below-guideline sentence.

25       For that reason, even if I had the legal latitude to

1    departure downward, I would not do so.  I'll instead consider

2    Mr. Strong's mental health difficulties in my assessment of the

3    3553(a) factors.  I do believe these difficulties are

4    mitigating factors in this case.

5              Having covered all that background, does the

6    government wish to be heard with respect to sentencing?

7              MR. SMITH:  Yes, your Honor.  I'd like to just begin

8    by noting that although there are a lot of letters from the

9    defendant's family, there are no letters from Mr. Avila-Gomez's

10   family.  We have made efforts to reach Mr. Avila-Gomez's

11   family.  From what we understand, they are probably still in

12   Honduras.  As your Honor will recall from the trial testimony

13   and evidence, Mr. Avila-Gomez came to the United States, was

14   working here, and supporting his family.  One person whose life

15   he touched while he was here was Eduarda Tavarez, who testified

16   that she had been essentially her landlord -- his landlord, but

17   also friend.  And I think that provided some context for

18   Mr. Avila-Gomez's life, but I do think it's significant in

19   thinking about the impact that Mr. Strong's crime has had on

20   real people, that Mr. Avila-Gomez was here, working, providing

21   support to his family in Honduras.  And there is a very deep

22   irony that Mr. Avila-Gomez came here from a country that is

23   ravaged by gang violence in the hope of being able to work and

24   support his family, and he was murdered on the streets of

25   Yonkers.

1            I think with respect to the seriousness of the offense

2    here, it is extraordinarily serious.  This is not criminal

3    conduct that one can confidently say Mr. Strong will walk away

4    from even if he does not return to gang violence.  It was not a

5    violent crime that was motivated by any sort of retaliatory

6    desire, as some of them that your Honor has become familiar

7    with were.  It was driven by a combination of loyalty to

8    friends, fellow gang members, and also by one of the gang

9    member's financial interest.

10           So this is -- I think the seriousness of this crime

11   and its motivations, I think, cannot be tied to any time and

12   place, and I think that is particularly true because of its

13   relative recency.  One of the things your Honor pointed out in

14   the sentencing of another defendant, Limet Vasquez, was that

15   the murder in that case had taken place in 2005, and that was

16   significant because Mr. Vasquez was arrested several years

17   later, was not involved ever again in conduct, at least of that

18   nature.  He was involved in some other incidents.

19           By comparison, Mr. Strong was involved in this

20   incident in 2009 and was arrested in 2011.  So unlike

21   Mr. Vasquez, who had several years, including some years after

22   being released from prison, to demonstrate at least the

23   beginnings of a track record which was reflected in letters

24   from his family, Mr. Strong has not demonstrated that at all.

25   And I thought it was notable that the two recent letters that

1    were supplied indicated that the family doesn't believe that he

2    has overcome some of these challenges.  They actually were

3    surprised that he was arrested for anything more serious than a

4    suspended license.

5              THE COURT:  I was struck as well by the fact that the

6    letters both effectively assert his innocence.

7              MR. SMITH:  And that's correct, your Honor.  Our

8    position is that a within guideline sentence is appropriate

9    principally to reflect the seriousness of this offense.

10             THE COURT:  What's your assessment of the

11   incapacitation rationale, the need for a sentence to protect

12   the public?  It's a -- the circumstances reflected in terms of

13   mental faculties ironically -- although mitigating perhaps from

14   a level of moral justification, may ironically point in the

15   other direction in terms of public protection.

16             MR. SMITH:  That's correct, your Honor.  I think it's

17   troubling that -- just considering the factual circumstances of

18   this incident.  Mr. Strong wasn't forced to join this robbery

19   conspiracy.  There's no evidence that anyone ever pressured him

20   into doing it.  He was, as your Honor will recall from the

21   testimony, like the other cooperating -- like the cooperating

22   witnesses who testified, was simply asked.  Mr. Lopez-Cabrera

23   described the circumstances he was dealing with, that he had a

24   drug debt, and that he wanted some support, and Mr. Strong and

25   the other individuals volunteered.  And it was really as simple

1    as that.

2             I think one of the things that the trial record made

3    clear is that there was this gang norm that required loyalty of

4    this sort, but I don't think that it was just the gang norm

5    that caused Mr. Strong to participate in this.  I think he was

6    not able to demonstrate the kind of judgment that would be

7    required to not go along with a plan that had these very

8    devastating consequences.

9             I don't think there's anything in the record that

10   suggests he has changed or has matured.  I think he presents

11   the same risk of going along with these sorts of crimes today

12   that he did four years ago or six years ago.  So I do think

13   that that is a very serious consideration.

14            It also is, we agree, a mitigating circumstance.  We

15   do think that it is, though, a mitigating circumstance that has

16   to some extent already been accounted for in our agreement to

17   reduce, under 2A1.1, the offense level for his conduct, because

18   that was one of the reasons why we thought it was appropriate

19   to agree in the plea agreement to that downward departure,

20   which is --

21            THE COURT:  Is that right?  I thought the three-level

22   reduction really reflected the lack of a specific intent to

23   murder regardless of whether that defendant in question had

24   powerful or less powerful mental faculty.

25            MR. SMITH:  It is a fact that there was no specific

1    intent to murder that makes Mr. Strong qualified for that

2    downward departure, but the qualification doesn't necessarily

3    have it lead to its applying, and I think it is within, I

4    think, the discretion of the Court whether it should.  We

5    agree, of course, that that was the right decision.

6            One of the reasons we thought it was the right

7    decision was because of his state of mind, which includes not

8    just the fact that he didn't have a specific intent to bring

9    about a death, but also because of his less sophisticated

10   mental faculties.  So we think to some extent, that's already

11   accounted for in the reduction.

12           THE COURT:  All right.  Thank you.

13           Let me just ask a few technical questions.  You've

14   already answered my question as to whether there are any

15   representatives of the victim, Mr. Avila-Gomez, who in any way

16   either are physically present or in any other way have

17   communicated with the Court.  I appreciate that you have done

18   what you can to reach out to them.

19           Forfeiture, restitution, is the government seeking

20   either of those?

21           MR. SMITH:  No, your Honor.

22           THE COURT:  Thank you.

23           Mr. Nkrumah, do you wish to be heard?

24           MR. NKRUMAH:  Yes, I do, your Honor.

25           Before I actually begin, your Honor, I just want to

1    address a couple of points that the government made.

2              THE COURT:  Just kindly speak into the microphone.

3    Thank you.

4              MR. NKRUMAH:  Actually, to begin, your Honor, I'm

5    going to address a couple of points that the government made.

6              First, your Honor, we don't in any way want to

7    minimize the death of Mr. Avila-Gomez.  It was a senseless

8    murder committed by a codefendant of Mr. Strong's, unbeknownst

9    to Mr. Strong, not directed by Mr. Strong, or anything in that

10   nature.  It was, again, a senseless murder that should have

11   never happened, a senseless loss of life that we -- when I say

12   "we," your Honor, I include Mr. Strong -- greatly regrets and

13   greatly regrets being there that night.

14             In the letters that were handed up to the Court from

15   Mr. Strong's family, your Honor, I would ask the Court not

16   to -- to try to take into context when the family writes that

17   they didn't believe that Mr. Strong had done anything wrong.

18   In the context of the family -- the way the family is looking

19   at it -- and this is something that I've had to explain to

20   Ms. Strong and her husband at the onset of the charges and

21   throughout and is something that they have difficulty grasping,

22   and really I understand, because most people who do not travel

23   in the circles that we travel and understand the law as we do

24   have great difficulty understanding the conspiracy law.  They

25   understand that Miguel was with some kids who did something

1    wrong and something bad.  What they don't understand is that

2    him being present, and not just being present, but agreeing to

3    the overall plan which resulted in the end result of murder,

4    ties him into it as if he pulled the trigger.  They look at it,

5    like most people in the streets, most people in the public, who

6    don't understand conspiracy law look at it.

7           THE COURT:  But, Mr. Nkrumah, it goes beyond that.

8    And I don't mean to beat the point too hard, but it's one thing

9    to say that the law attributes responsibility for the murder to

10   Mr. Strong on account of his agreement to the robbery plan.

11   It's another thing to say -- and for somebody who's not a

12   lawyer to wonder why that is.  It's another thing entirely to

13   say he did nothing wrong.  By his own admission, he was a

14   willing participant in a robbery of an innocent person, which

15   happens to have led to a death.  It doesn't appear as if

16   Mr. Strong's family is aware of that fact.

17          MR. NKRUMAH:  Your Honor, I think -- I think the main

18   letter that you're referring to is the letter by his mother,

19   Maxima Medina, Ms. Strong.

20          THE COURT:  Well, I'm referring to both of the

21   letters.  Mr. Raphael Medina says he has not done anything, and

22   then his mother says my son has never done anything wrong.  So

23   both of them pretty much declaratively say it.  Again, it

24   doesn't bear on his culpability.  It offers a minor degree of

25   insight into the extent into which the family is aware of the

F2PKSTRS                       Sentence

1    side of him that participated in the gang-related conduct at

2    issue.

3              MR. NKRUMAH:  Your Honor, I believe that the family is

4    aware.  Again, in Ms. Medina's letter, she states that she did

5    not -- to her knowledge, she never knew that he had done

6    anything bad.  Again, to her knowledge.  Coming to grips with

7    something like this -- coming to grips with something like this

8    is something that some people take to readily, and some people,

9    it takes time.  Again, your Honor, in the discussions that I

10   have had over the years with the family regarding these

11   charges, we have talked about this, and they do understand --

12   they do understand that Miguel was involved in gang and -- was

13   involved in the Trinitarios gang, they do understand that

14   Miguel's involvement in that gang led to incidents.

15             When they state that he didn't do anything wrong,

16   they're not necessarily denying the fact that Mr. Strong was

17   involved in these incidents and shouldn't be punished for his

18   actions.  What they're basically stating, your Honor, as,

19   again, unsophisticated people who are not from this country,

20   who were not raised in this country, and who have different

21   understandings than we may have in this country, their

22   understanding, which may not comport totally to ours, it may

23   take them time to understand what has happened to truly

24   understand what has happened.  But, your Honor, that in no way

25   denies the fact that they understand what's going on with

F2PKSTRS                         Sentence

1   Mr. Strong.  They support Mr. Strong thoroughly in this, and

2   they are committed to doing everything they can to not only

3   help Mr. Strong through his prison sentence, but afterwards.

4           The last thing, your Honor, that I'd like to address

5   before I go into my final remarks regarding Mr. Strong's

6   sentencing is the matter of nothing showing that Mr. Strong has

7   matured.  I totally don't agree with that.

8           I just use as an example his prison record.  Now,

9   Mr. Strong has been incarcerated for over three years in this

10  matter.  If you count from the time of the murder, which was in

11  2009 --

12          THE COURT:  He was arrested in December 2011, correct?

13          MR. NKRUMAH:  Yes.

14          If you count the time from the murder, as the

15  government has done for the other defendant, and said that he

16  showed five years instead of Mr. Strong's two years, if you

17  count those two years, plus the time that Mr. Strong has been

18  in this environment and a little bit about MDC, the environment

19  that he's in, and his disabilities, which makes him a different

20  offender from a non-ill offender, which makes the effect of

21  jail in prison upon him as an ill offender different.

22          As the Court is aware of Mr. Strong's disabilities, I

23  won't go into it.  Those disabilities prevent Mr. Strong from

24  doing a number of things -- a number of things within the MDC

25  community that normal inmates -- normal clients who are

1    awaiting the resolution of their cases are allowed to do,

2    programs, getting involved in jobs that pay, try to study for

3    their GED if they don't have them.  Because of Mr. Strong's

4    disabilities, he's not able to do any of those things, your

5    Honor.  24 hours a day, seven days a week, Mr. Strong's life is

6    a continuing, continuous life of boredom, of stagnation, and

7    the little bit of activity that's available to alleged

8    offenders in the jail, Mr. Strong can't participate in.

9    Despite all of this, your Honor, Mr. Strong, in the three and a

10   half years that he's been incarcerated, has had one infraction

11   in the MDC, which I believe, your Honor -- let me back up.

12          He's had one infraction in the MDC, your Honor.  On

13   top of that, this young man, when I first met him, couldn't

14   speak a lick of English, couldn't read a lick of English, nor

15   Spanish.  Today, when I go to visit Mr. Strong, in the three

16   and a half years, something that the public school system

17   wasn't able to help him do, he talks to me in English.  He

18   tries his best.  He wants to try to take his GED, he wants to

19   learn how to read and write, he understands how important it

20   is, but, most importantly, he understands how important it is

21   for him to try to overcome the disabilities that he has.

22          At the time of this murder, I believe Mr. Strong may

23   have been 18 years old.  Even though by legal standards an

24   adult, by no means was Mr. Strong at 18 years old an adult.

25   Mr. Strong, as the Supreme Court has noted to juveniles, was a

F2PKSTRS                    Sentence

1    juvenile in every sense, and his mental disabilities further

2    hampered his ability to reason, his ability to understand

3    consequences, his ability to do the things that you and I can

4    do on a regular basis.

5         Today, Mr. Strong has gotten better in that.  Every

6    time we meet and I speak with Mr. Strong, I tell him about

7    protecting himself where he is, because this court is aware of

8    the incidents of assault that happens in jails and mostly in

9    prisons.  He tells me that he will.  I tell him to really,

10   really scrutinize, really look at the people who call

11   themselves his friends.  He better understands that now, your

12   Honor.  He's sorry.  I know he's sorry that he had to go

13   through this to understand that, but he better understands that

14   now, and he does.  He stays to himself.

15        Unfortunately, that's a trait of incarcerated

16   individuals with mental disabilities – they do tend to stay to

17   themselves, and he does do that in the MDC, but the few friends

18   that he has made in the MDC, one who helped him write the

19   letter that I will read to the Court on his behalf, those are

20   friends that he's –- he went through a different vetting

21   process than the process he went through with the friends who

22   led him into the Trinitarios.  This young man has grown into a

23   man in those three and a half years, a young man, but this

24   young man still suffers from the same disabilities that

25   crippled him at the time that he made the decision to join

1    these individuals in the robbery plan, a plan that he had

2    nothing to do with in the sense of formulating the plan, a plan

3    that he had nothing to do with in the sense of picking out the

4    victim, and a plan he had nothing to do with in the sense that

5    he didn't carry a weapon, nor did he choose to.

6           This young man is a different man today from that

7    young man, still fighting the disabilities that he will fight

8    for the rest of his life.  But to say that there is no sense of

9    improvement is outlandish at best.

10          I'm not going to go over what was in my sentencing

11   memorandum, your Honor, to a great extent because I know that

12   this Court has read it fully.

13          THE COURT:  I have.

14          MR. NKRUMAH:  But I will highlight just a couple of

15   things, your Honor.  And what I will highlight is my client's

16   mental health disability.  Individualized sentencing is the

17   standard in this country.  The Supreme Court has said it, the

18   Second Circuit has said it, and all the other circuits have

19   held that the law sentences each defendant as an individual,

20   taking into account all of his circumstances.  The Supreme

21   Court has also held that individuals who suffer from mental

22   health disabilities should be viewed differently from other

23   individuals in sentencing.

24          The Court realizes that people who suffer from mental

25   health disabilities can be easily manipulated, which is what

1    happened not only in this incident, your Honor, but in his

2    entire involvement with the Trinitarios set.  He may not be

3    fully able to comprehend situations and consequences of the

4    decisions because they are incapable of logically working the

5    consequences to their conclusions.  That is exactly what

6    happened in the incident that Mr. Strong is now standing before

7    this Court in.

8            That mental health disability defendants are often

9    used by codefendants who gain a trust and friendship of the

10   mentally disabled individual, who then is afraid to not go

11   along because that person is afraid to lose their friendship.

12   And as I stated in my sentencing memorandum, your Honor, that

13   was the case with Mr. Strong.  When Mr. Strong came over to the

14   United States, he didn't want to come.  He lost his

15   grandfather, who was his best friend, who was his everything in

16   Santo Domingo.  As stated in letters, and in the sentencing

17   memorandum, and in the reports by the psychiatrist, when

18   Mr. Strong lost his grandfather, he lost his world.

19           When his mother brought him over here, he was lost.

20   He couldn't speak the language, English or Spanish, because he

21   had no schooling in Santo Domingo.  He couldn't operate in a

22   regular public school.  This Court understands how cruel

23   children can be, and that cruelty didn't pass Mr. Strong here.

24   They didn't see Mr. Strong and see his disabilities and say, I

25   feel for you, let me help you.  They saw Mr. Strong, realized

1    his disabilities, and ridiculed him to the point where

2    Mr. Strong avoided people, wouldn't go to school, everything.

3    Here comes his friends, here comes the Trinitarios, they can

4    use him because he's a big kid.  They can use him because they

5    see that in order for him to keep their friendship, the only

6    friends that he has, he's willing to do what they ask him to

7    do, help them in their endeavors.

8           Everything that Mr. Strong did, every offense that the

9    government alleges Mr. Strong did in this -- in this incident

10   and his involvement with the Trinitarios are offenses that

11   mentally disabled individuals commit when they're being used in

12   that manner.  These were offenses that Mr. Strong didn't think

13   about and do on his own, but was told to do, or followed,

14   because of the position that he was in, because of the mental

15   disability, because of the position that he was in, because of

16   the fact that because of that disability, his inability to make

17   friends, his inability to connect.

18          And as I stated in the sentencing memorandum, as you

19   saw in some of the letters, your Honor, it just didn't end with

20   the friends.  Even at home, Mr. Strong was ridiculed.  Even at

21   home, Mr. Strong did not receive the support that he needed at

22   that time to overcome these disabilities.  His brother, who he

23   went to school with, ridiculed him in front of girls to the

24   point, your Honor, where one time, Mr. Strong attempted to take

25   his life, where his sister, Eswilda, realized something was

1   wrong, found him, made him throw up all that he swallowed, and

2   then the two of them never told Mom.

3          This is the type -- these are the circumstances

4   surrounding Mr. Strong's being inducted into this gang.  These

5   are the circumstances that surrounded Mr. Strong the day he

6   agreed to drive, an agreement made in happenstance, your Honor,

7   because they knew that Mr. Strong could get his hands on the

8   vehicle.  Why?  Because Mr. Strong used that vehicle to try to

9   support himself.  He can't read, he can't write, he can't make

10  change, but he goes to shopping centers, and he helps

11  individuals with their packages, drives them home for a flat

12  fee.  He memorizes the road so he can get back and forth, so he

13  wouldn't get lost.  These are the things that Mr. Strong did to

14  try to support himself.  And he used the van, which his family

15  helped him to get, because they were encouraged that he was

16  doing something independently maybe one of the first times in

17  his life.  These kids took advantage of that, and Mr. Strong

18  sits here before you today.

19         We talk about his adjustment to incarceration, your

20  Honor, and he's adjusted well in the MDC, but the MDC, as this

21  Court is aware, is a jail and is entirely different from where

22  Mr. Strong will eventually serve out the bulk of his sentence,

23  which is in one of the prisons of the United States Government.

24  This Court is aware of what happens in prisons.

25         Criminal punishment involves hard treatment, your

1   Honor.  Imagine the typical offender without major mental

2   health problems sentenced to a term of ten years in prison.  He

3   enters prison nervous, but determined to protect his physical

4   and well-being.  That's every person who enters a prison, your

5   Honor.  Initially he keeps to himself and appraises his new

6   environment.  He soon discerns the hierarchy among prisoners,

7   the benefits and risks of membership of various groups, and the

8   dynamic between prisoners and guards.  He learns both the

9   disciplinary rules imposed by the prison, and through

10  observation of a few well-placed questions, the unwritten rules

11  among prisoners.  He pays careful attention to what conduct and

12  speech will constitute a violation of these rules as well as

13  the consequences that will follow.  He learns how to put up a

14  tough front, avert danger, and respond to confrontations in a

15  way that will deter further acts of aggression.  He forges

16  alliances, he develops a routine.  In a nutshell, he copes.

17  After a period of a few months, he adjusts.  He learns to live

18  with his sentence.

19          Now, your Honor, imagine an offender serving the same

20  sentence for the same crime committed with the same degree of

21  culpability with an Axis I disorder, mental disability, such as

22  schizophrenia, depression, bipolar disorder, seriously ill, yet

23  declined competent.  He enters prison in the midst of

24  delusions.  He has been found, and they have gotten him.

25  Unsure of whom to trust, he keeps to himself, avoids eye

contact, and mutters to himself anxiously.  Because his

thoughts and speech are disorganized, he obsessively repeats

himself, uses fabricated words, and delivers nonsensical

statements as though they were commonplace observations.  He

soon earns the nickname Bug, prison slang for a mentally ill

inmate, and becomes a target for physical and sexual abuse.

Feeling alienated and distressed, he withdraws to his cell.

His isolation morphs into personal neglect, and guards respond

by disciplining him for hygiene violations, and he refuses to

leave his cell.

After weeks of silent abuse, he strikes another

prisoner and lands in solitary confinement.  The mental strain

of isolation, and forced boredom, and constant illumination of

his cell propel him into a deep depression and leads to a

psychotic breakdown.  He serves most of his prison term

disoriented, alone, and suffering.

I know the consequences of prison life are not what

this Court intends when this Court imposes a sentence that it

will impose on Mr. Strong.  But these consequences, your Honor,

are real.  These consequences, your Honor, are what Mr. Strong

may -- what Mr. Strong may face, a real possibility of facing,

because his mental illness is the kind that eventually someone

will realize.  If it's not, when he's going to go get his

medication, someone will realize it.  If it's not, when he's

talking, someone will realize it, and they'll realize that he's

1     an easier mark.

2             Physical assaults in prison, they're doubled for

3     people with mental illness, the Department of Justice, Bureau

4     of Prisons statistics report.  Physical assaults are doubled

5     for inmates in Mr. Strong's condition.  Sexual assaults,

6     they're 1.2 times more likely to be sexually assaulted than

7     nominal offenders.  Disciplinary, your Honor, I talked a little

8     about the rules, formal, informal.  Well, when he breaks the

9     formal rules, he loses privileges, visitation, and, most

10    importantly, how these prisons in this country deal with our

11    mentally ill is he's placed in solitary confinement, a

12    condition and a state that can only help but exacerbate his

13    mental condition.

14            Breaking the informal rules, your Honor, can bring

15    anything from a beating to death, and this is something that

16    Mr. Strong has to deal with differently from a regular

17    offender.

18            Your Honor, we understand that these possible

19    consequences of prison life are unintended consequences of this

20    Court's sentence, but these unintended consequences are the

21    real possibilities for Mr. Strong, and nonetheless, we believe

22    that a sentence of 120 months adequately addresses all of these

23    issues and the issues found in 18 U.S.C. 3553.  A sentence of

24    120 months, your Honor, is a sentence we believe the public,

25    for whom's behalf this sentence is also being imposed, will

1    agree with and find just based on all of the circumstances and

2    not just that one incident, that one night.

3          And finally, your Honor, we believe that the family of

4    Mr. Avila-Gomez would agree with us that a sentence of 120

5    months is appropriate for someone who was only a driver,

6    someone who never saw the victim, someone who didn't have any

7    input into the robbery plan whatsoever, someone who didn't have

8    any say as to who would be chosen to be a victim, someone who

9    never carried a weapon, and someone who suffers from the type

10   of mental disabilities his entire life.  This didn't start the

11   day before it happened, this didn't start when Mr. Strong got

12   into the MDC and realized that he needed -- that this may help

13   him, this is something that Mr. Strong has been dealing with

14   from the day he was born, and it's well documented.

15         We believe that a sentence of 120 months, your Honor,

16   is an appropriate sentence, a proportionate and just sentence,

17   that serves the interests of the public and this Court, and

18   also serves as deterrent for those who would like to place

19   themselves in Mr. Strong's position.  Contrary to what the

20   government believes, your Honor, Mr. Strong has learned his

21   lesson.  It's something we talk about all the time.  Mr. Strong

22   misses his family, and his family misses him.  While

23   incarcerated, Mr. Strong became a father and wants the

24   opportunity to raise his daughter and his stepdaughter, who

25   happens to be deaf and suffer from her own disabilities.

1            As crazy as this may seem, your Honor, Mr. Strong's

2      life is a guiding light to his family, to his daughter with

3      disabilities, who when she comes to visit him, can hear him

4      struggling to try to speak English and trying to better

5      himself, an inspiration for her to do the same despite her

6      disabilities, inspiration to his little brother who sits in the

7      audience.  When he goes to visit Miguel and sees Miguel, and

8      Miguel can't go home with him, he understands that hurt.  He

9      understands the hurt that it places on not only himself, but

10     his family and his mother, and he doesn't want it anymore.  And

11     he doesn't want it for him.  He doesn't want it for him, he

12     doesn't want it for Miguel, but most importantly, he

13     understands to not follow.

14            Your Honor, 120 months is an appropriate sentence for

15     Mr. Strong, and we ask that you impose a sentence of 120 months

16     to satisfy the sentencing.  Thank you.

17            THE COURT:  Thank you, Mr. Nkrumah.

18            Let me just take a moment and just recognize your

19     extraordinary commitment and passion for your client's cause,

20     and I applaud you for that.

21            MR. NKRUMAH:  Thank you, your Honor.

22            THE COURT:  Okay.

23            Mr. Strong, do you wish to make a statement?

24            MR. NKRUMAH:  Your Honor, there is a letter that

25     Mr. Strong had someone in the jail help him write.  If the

1    Court would allow me, I can read it to the Court.

2              THE COURT:  Sure.  Let me just confirm with Mr. Strong

3    that these are, in fact, his thoughts.

4              Mr. Strong, Mr. Nkrumah has put in front of you a

5    written letter.  Are the thoughts that are expressed in that

6    letter your thoughts?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Okay.  And you have reviewed those words,

9    and they are what you want to communicate to me?

10             THE DEFENDANT:  Yes.

11             THE COURT:  Mr. Nkrumah, by all means, go ahead.

12             MR. NKRUMAH:  Thank you, your Honor.

13             "Dear Honorable Judge Engelmayer:  I am writing this

14   letter so that you can know a little bit more about my life,

15   and so you can actually know who I am.  Beforehand, I'm letting

16   you know that I place someone to write this letter for me as I

17   cannot read or write, but everything in this letter is from

18   me."

19             And, your Honor, I'm going to read the letter to you

20   exactly as it's written without putting in pronunciations and

21   everything else.

22             THE COURT:  Of course.  Thank you.

23             MR. NKRUMAH:  "I admit that I have committed a lot of

24   errors in my life.  The reason for my errors and my

25   responsibility, I can only say was my adolescence and letting

1    others influence my actions.  In the time I have been

2    incarcerated, I have come to value and think better of things

3    because I know that everything that happens in life is for a

4    reason.

5           My God has given me two beautiful little girls that

6    are adorable and all to myself, and I don't want them to go

7    through the things I went through when I was young.  I was

8    raised up until I was ten or eleven by my grandparents, and I

9    suffered a lot when I lost my grandfather.  I want that when

10   you read this letter for you to forget that you are a judge and

11   put yourself in a position of a young man that never had no

12   guidance and nothing in which to grasp to.

13          When I got to New York City, I came to live with my

14   mom and siblings.  From my childhood, I have always wanted to

15   learn to read and write, but as you can imagine how hard it has

16   been always asking for help so I can be able to move forward.

17   Because even though it sounds hard, I have always wanted to do

18   my things on my own.

19          For example, at 12 or 13 years old, I can't really

20   remember because my memory is not that good, I started working

21   at a supermarket as a delivery boy.  At 14 or 15 years old, I

22   took a steering wheel without knowing how to drive.  I learned

23   on my own.  I turned into a cab driver with a minor problem – I

24   did not have a license.  The reason which was because I did not

25   know how to read or write.  Besides that, I never lost focus as

my goal, which was to be able to progress.  Which placed me to

put extra cushions on the driver's seat to appear to be taller

and continue to work.

         You will probably come to ask yourself, where was my

mother at the moment?  To tell you the truth, I had to stumble

here to learn that a mother is only one because she was the one

that I used to take her car in order to work.

         Years passed, and at 20 years old, I was able to get a

license.  When I went to the DMV the first time, another

obstacle was placed upon me.  What happened was that I had a

daughter and a wife which I had to maintain.  Taking my license

wasn't that hard because I only owed the quantity of $10,000 in

tickets, and my grandma gave it to me as a present because she

said that was a gift from God, me being able to obtain a

driver's license.  And I know when I get out of here, I will do

anything possible so that my kids and nephew won't have to go

through what I went through.

         I'm not saying everything I've been through so that

you can show pity on me, it's so you can know, more or less,

something about my life.  I also want you to know that on the

ninth month and the fourth day of 2009, my only error was being

a driver.  I know that in the plea agreement I took before your

Honor, I had to accept a lot of responsibilities of what

happened that day, and I did.  And the reality is that it was

me.  I wasn't forced to plea, but I did fear that just because

F2PKSTRS                        Sentence

1   I was the driver, I would never be able to see my kids or

2   family again because another person wants to commute their

3   prison time and not accept responsibility for their actions.

4          I'm not saying I'm innocent, but I want that on your

5   authority that you sentence me to my participation as you see

6   fit.  Because last time I went to court, the last thing I

7   remember you saying to me was that you don't have to be

8   persuaded by either the government, or lawyers, or anyone, that

9   you in the end decide what you see is fit.  I have never

10  decided to cause harm towards anyone.

11         If I had the power to -- out of the 79 codefendants I

12  had, if I had the power to place them in front of them one at a

13  time, you can only take out that will talk negative of me, and

14  that's the person that committed his crime and doesn't want to

15  accept full responsibility for his crime.

16         Like I was telling you, another thing that happened in

17  my life, like how was it that I joined the gang, this started

18  at the age of 14 or 15 when I started in Kennedy High School.

19  Around there were a lot of gangs.  I'm not saying the school

20  was bad, the students were what made it bad.

21         I met a few of my codefendants, and throughout that, I

22  started sharing with them without knowing what was right or

23  wrong.  We ate together, hung out together, but since I wasn't

24  part of the gang, I couldn't hear what they were talking about.

25  A lot of people think that they haven't lived this life, that

1    the one that enters a gang is for protection in order to be

2    someone big in life.  Whoever hasn't lived this life doesn't

3    know what this is.  I'm giving you an example.

4           My mom is single, we are four siblings.  My mother

5    used to be called from school that I had any type of problem

6    there, and when I got home, I would get beaten.  I would be

7    asked what was wrong with me.  I studied with people in

8    wheelchairs and helmets, and I didn't have anyone to speak to,

9    and that's where what I thought were my friends came into

10   place.  They were older, and they pulled me to their side.

11   Almost at the age of 14, they invited me to try cocaine and

12   guns, but I left because I realized that this wasn't for me.  I

13   wanted to leave, but there was love missing.  Now, I asked

14   myself, like I said before, out of the 79 codefendants, have

15   they seen me with a knife or a gun?  Never, because that's not

16   me.

17          Changing the subject, because if I was the victim, my

18   family would want to know who are responsible.  Even though I

19   did not know the victim, I think that what's wrong is wrong,

20   and one way or another, I had something to do with it.  And

21   believe me, I am regretful of going out that day.  I got

22   nothing in exchange.  We went out to rob.  But what did we

23   steal?  Not even the cell phone or the money.

24          I'm not sure how to explain what happened that day.

25   These are the reasons which I am apologizing to the victim's

F2PKSTRS                         Sentence

1    family and sending my condolences to them, because the life of

2    a person that was not doing anything wrong was taken.  And to

3    my family, for what I am putting them through.  Thank you --

4    "and to my family for what I am putting them through.  Thank

5    you, your Honor, for your time."

6              THE COURT:  Thank you.

7              Mr. Strong, is there anything further you would like

8    to say today?

9              THE DEFENDANT:  No.  Thank you very much.

10             THE COURT:  Mr. Nkrumah, may I just ask you, in the

11   course of your client's statement, there was a reference made

12   to a person or persons who did not accept responsibility for

13   their crimes.  It was not entirely clear to me who that was a

14   reference to.

15             MR. NKRUMAH:  Your Honor, that's a reference to the

16   person that he believes snitched or told about the offense, and

17   the reason why he did it, to try to lower -- lessen his

18   sentence, and in Miguel's mind, not take full responsibility

19   for his actions because he's the one who pulled the trigger

20   according -- Miguel believes he knows who the cooperator was.

21             And he believes that the cooperator was the person who

22   pulled the trigger, and he believes that the cooperator

23   cooperated the way that he did to lessen his time because he

24   didn't want to take the full responsibility and be sentenced

25   fully for his actions.

1          THE COURT:  Thank you.

2          Mr. Smith, just for the benefit of the clarity of the

3    record, since this was developed during the trial of another,

4    remind me the name of the cooperating witness who testified at

5    the Lopez-Cabrera trial who admitted that he, in fact, was the

6    person who pulled the trigger.

7          MR. SMITH:  Yes, your Honor.  It was Jose Marmelejos.

8          THE COURT:  Very good.

9          Just purely for clarity of the record's sake,

10   Mr. Strong, Jose Marmelejos, who I believe must be the person

11   you're referring to, admitted at the criminal trial of Felix

12   Lopez-Cabrera that he, in fact, was the gunman.  So whatever

13   your views are about whether or not that person is or isn't

14   taking responsibility, as a factual matter, he has admitted

15   being the gunman in that offense.

16         Does anyone else have anything they want to say before

17   I impose sentence?

18         MR. SMITH:  No, your Honor.

19         MR. NKRUMAH:  No, your Honor.

20         THE COURT:  I'm going to take a moment and collect my

21   thoughts.

22         (Pause)

23         THE COURT:  Is there any reason why sentence should

24   not now be imposed?

25         MR. SMITH:  No, your Honor.

1          MR. NKRUMAH:  No, your Honor.

2          THE COURT:  As I have stated, and as counsel have

3     agreed, the guideline range that applies to this case is

4     between 210 and 262 months' imprisonment.  Under the Supreme

5     Court's decision in Booker and the cases that have followed it,

6     however, the guideline range is only one factor that a court

7     must consider in deciding the appropriate sentence.

8          The Court is also required to consider a number of

9     other factors, the other factors set forth in Title 18, United

10    States Code, Section 3553(a), the sentencing statute, and these

11    facts include the following:  The nature and circumstances of

12    the offense and the history and characteristics of the

13    defendant, the need for the sentence imposed to reflect the

14    seriousness of the offense, to promote respect for the law, and

15    to provide just punishment for the offense, the need for the

16    sentence imposed to afford adequate deterrence to criminal

17    conduct, the need for the sentence imposed to protect the

18    public from further crimes of the defendant, and the need for

19    the sentence imposed to provide the defendant with needed

20    educational or vocational training, medical care, or other

21    correctional treatment in the most effective manner.

22          It is important that the Court avoid unwarranted

23    sentence disparities among defendants with similar records who

24    have been found guilty of similar conduct.  In a case such as

25    this, involving many dozens of defendants, I endeavor, as I

1    have in this particular sentencing, to make sure that the

2    sentence imposed here bears a rational relationship to the

3    other sentences imposed in the case.

4            The Court is also required to impose a sentence

5    sufficient, but no greater than necessary to comply with the

6    purposes that I have just described.  I find that the sentence

7    that I'm about to pronounce is sufficient, but not greater than

8    necessary to satisfy the purposes of sentencing that I just

9    mentioned.

10           Mr. Strong, I've given a lot of thought and attention

11   to the appropriate sentence in your case in light of those

12   so-called Section 3553(a) factors and the appropriate purposes

13   of sentencing as set out in the statute, and the following are

14   my thoughts:

15           Arriving at the just and reasonable sentence in this

16   case is challenging.  On the one hand, you engaged in truly

17   terrible criminal conduct, including participating in the

18   felony murder of David Avila-Gomez.  On the other hand, there

19   are significant mitigating facts involving your background and

20   your mental acuity.

21           As to your conduct on September 4th, 2009, you and

22   four other members of the Bad Boys faction of the Bronx

23   Trinitarios gang set out to commit a robbery.  You were the

24   driver, and you supplied the car.  A gun was brought, it was

25   stashed behind the glove compartment of the car.  The group of

1   you spotted David Avila-Gomez.  He was spotted in Yonkers

2   holding a cell phone.  The group decided to rob him.  Three of

3   the five of you got out of the car, you stayed behind.  One of

4   your coconspirators, Jose Marmelejos, pulled the gun on

5   Mr. Avila-Gomez, and when he resisted, shot Mr. Avila-Gomez

6   three times.  The five of you -- all of you heard the gunshots.

7   The five of you then drove away, leaving Mr. Avila-Gomez to

8   die, which he did.

9           I understand that when you set out that day, you did

10   not plan to kill anyone.  That is important context.  Your goal

11   was to rob, not to kill.  That is the reason why I found the

12   three-level downward departure, the three-level reduction, from

13   the guideline sentence appropriate.  Were it not for that

14   reduction, your guideline range would have been between 292 and

15   365 months' imprisonment, not between 210 and 262 months.  But

16   make no mistake, it was also foreseeable that death would

17   result from your mission.  That was why the group brought a

18   gun.

19           When a robbery at gunpoint is carried out, it is

20   always possible that events will escalate, and that the gun

21   will be fired.  And so although you weren't the gunman, and

22   although you didn't personally decide to do the shooting and

23   didn't learn of the actual shooting till you heard it

24   occurring, you are among those responsible for it.  That is the

25   premise of the felony murder doctrine.  Felonies, like armed

1  robberies of David Avila-Gomez, carry with them the risk of

2  murder breaking out.

3         From the vantage point of Section 3553(a), I need to

4  consider the seriousness of your criminal conduct.

5  Participation in a robbery and the felony murder of an innocent

6  civilian just to steal a cell phone is terribly serious.  The

7  murder of David Avila-Gomez was a shocking and terrible event.

8  An innocent man died, and his family will suffer forever

9  because the five of you wanted his cell phone.

10        And it gets worse than that, because the reason for

11 the robbery was to advance the goals of a violent street gang,

12 the Trinitarios.  The gang needed money to allow Felix

13 Lopez-Cabrera, "Suztancia," to pay a drug debt, and stealing

14 the cell phone was a means to get that money.

15        Your conduct is also serious because the robbery was

16 planned out in advance.  That is why you got the car.  It

17 wasn't an impulse event.

18        And afterwards, as reflected in the presentence

19 report, the group of you continued to look for people to rob.

20 According to paragraph 76 of the presentence report, the group

21 thereafter headed from Yonkers to Haverstraw to locate an

22 individual who owed Mr. Lopez-Cabrera money for drugs, and once

23 he could not be found, according to the presentence report, and

24 I am quoting, "Once in Haverstraw, the group burglarized

25 several cars on the street."

F2PKSTRS                        Sentence

1          And the attack on David Avila-Gomez was not the only

2     act of violence in which you personally engaged.  Your counsel,

3     Mr. Nkrumah, described the robbery and murder of

4     Mr. Avila-Gomez as if it were a unique event, and to the extent

5     that murder occurred, I suppose that's true.  He said that one

6     incident, that one night, but there were other incidents, and

7     there were other nights.

8          According to the presentence report, you engaged in

9     two other violent incidents.  I'm now reading aloud paragraphs

10    77 and 78 of the presentence report.  Quote: "Strong was

11    involved in at least two other violent incidents, specifically

12    during the fall of 2006, in the vicinity of 228th Street in

13    Bronx, New York, Strong and other codefendants chased members

14    of the Bloods for numerous blocks and assaulted them.  During

15    this incident, one codefendant was armed with a cane, and

16    Lopez-Cabrera was armed with a machete.  Strong assaulted one

17    of the victims with a golf club."

18         Paragraph 78, quote: "Additionally, during the spring

19    of 2006, in the vicinity of 2477 Grand Concourse, Bronx, New

20    York, Strong and other codefendants participated in a beating

21    and stabbing of members of the DDPs.  During this incident,

22    among other things, Silverio," referring to a codefendant,

23    "stabbed a victim in the ear, and Lazallo," referring to

24    another codefendant, "stabbed a victim."  And these attacks,

25    too, were undertaken to strengthen the gang's hold.

1             Paragraph 74 of the presentence report states that you

2      became a Trinitarios in the mid-2000s, and you were a long-time

3      member of the Bad Boys sect.  From the perspective of Section

4      3553(a), a very long sentence is needed here, first because of

5      the seriousness of your acts, but it's also necessary to

6      promote respect for the law, and it's necessary to achieve just

7      punishment.  Your sentence needs to take account of the fact

8      that as a result of the incidents in which you engaged, one

9      man, David Avila-Gomez, is dead, and two others were beaten

10     and/or stabbed, and also as a result, the gang's grip on its

11     part of the Bronx was strengthened, at least until this case

12     was taken down.

13             I've now presided over two long trials involving

14     members of the Trinitarios, and it is clear to me that

15     incidents like the ones in which you participated created a

16     climate of fear and even terror, and they served to cement the

17     gang's hold over a part of the northwest Bronx.  Under Section

18     3553(a), I am also to consider the interest in general

19     deterrence, and that means the need to impose a sentence in

20     this case that is sufficient to deter other people from

21     committing crimes.  That is really important here.  Gang

22     violence is an epidemic problem in this City and in parts of

23     this nation.  A long sentence is needed to deter adolescents

24     and young men from joining violent gangs like the Trinitarios.

25     It is needed also to discourage young men like you from joining

F2PKSTRS                          Sentence

1    missions to rob, like the one to rob David Avila-Gomez that

2    ended up taking his life.  I want the next Miguel Strong to

3    pause before using his car and driving it to help violent gang

4    members commit a violent robbery.  So the sentence I impose

5    here today needs to be long enough to get the message across to

6    others to stop before engaging in violent gang activity.

7          There is also a separate interest in what is called

8    specific deterrence.  That refers to the need to impose a

9    sentence that is sufficient to deter you personally,

10   Mr. Strong, from committing further crimes.  And that interest

11   exists in this case because you have been arrested four other

12   times, according to the presentence report, in 2007, 2009, and

13   twice in 2010.  Although none of those offenses was nearly as

14   serious as the robbery and felony murder of David Avila-Gomez,

15   the point is that none of those brushes or encounters with the

16   law got you to stop committing crimes.  Instead, it appears an

17   arrest or a sentence was just a cost of doing business.  And so

18   the sentence I impose here needs to be a wakeup call for you,

19   it needs to be long enough and loud enough to get the message

20   across to you in a way that will register to not commit crimes

21   in the future or else you will stand to go to jail for a long

22   time.

23         Relatedly under Section 3553(a), I am to consider the

24   interest in incapacitation or protection of the public, and

25   that refers to the interest in protecting the public from you

1    that is served by your being in prison where you don't pose a

2    threat to rob, or steel, or hit someone with a golf club, or

3    participate in an assault.  That interest here, in my judgment,

4    is also significant.  You have been a participant in enough

5    violent acts, to give me grave concern that you are drawn to

6    such violence.  It is possible, as Mr. Nkrumah suggests, that

7    you have obtained greater maturity now since your arrest and

8    incarceration in this case, but I cannot be sure of it, and the

9    report from Dr. Shea, although mitigating in other respects,

10   gives me some hesitation in concluding that you have the

11   disposition to have thoughtfully reflected on the bad choices

12   you have made and learned from them, truly learned from them,

13   such that they won't be repeated in the future.  Simply put, I

14   cannot be sure that if you were back at liberty, you would not

15   continue again to associate with bad elements and be led to

16   commit crimes with them.  So I regret to say there is a public

17   interest in keeping you behind bars.

18          Thus far, I have considered at some length factors

19   that point towards a high sentence, and those facts are

20   considerable, but there are also factors that point in the

21   other direction, and I am going to review them now.

22          First of all, you accepted responsibility.  I applaud

23   you for that.  You pled guilty.  That matters to me.  Had you

24   not done so, your guideline range would have been significantly

25   higher, and so would the sentence I would have imposed.  I also

1   noted today that the apology that you prepared that Mr. Nkrumah

2   read on your behalf contained an apology to the victim's

3   family, to the family of Mr. Avila-Gomez.  Surprising as it may

4   seem, I don't always hear those apologies, and I appreciated

5   that that was included.

6           Second, as your counsel's very effective sentencing

7   submission has shown me, you have had more than your share of

8   adversity starting at a young age.  You grew up without a

9   father, you came to this country late and had a rough

10  transition, including in school, you had a lot of difficulty

11  assimilating, your family did not support you, and your brother

12  at times cruelly ridiculed you, and at least until the point at

13  which you were arrested, you could not read or write English.

14  And as Dr. Shea concluded, you have some significant cognitive

15  limitations and learning issues.  I don't see any point in

16  going through his report in detail, or for that matter, the

17  Social Security Administration's ruling in detail, but please

18  know that I have read those reports extremely carefully, and I

19  am incorporating by reference them here.  The broad point is

20  that your judgment may well have been impaired by intrinsic

21  factors for which you are not to blame.

22          To be clear, and as is not disputed, you clearly

23  understood right from wrong.  You knew that robbery and assault

24  were wrong, but I understand that the circumstances of your

25  life and your makeup may have made you perhaps more

F2PKSTRS                    Sentence

impressionable than some others in the Trinitarios gang, and as

Dr. Shea concluded, you were often the subject of withering

criticism at home.  I understand that all of this may have made

joining a gang more attractive to you.  It was a place where

you were accepted, and to some degree, valued.  None of that,

of course, excuses your crimes or participation in gang

violence, but it is important context, and I have it firmly in

mind.

          Third, under Section 3553(a), I am to consider your

history and characteristics apart from what I have just

mentioned.  From your counsel's sentencing submissions, I

learned not only of your hard life and some of the limitations

and challenges you faced, I also understand that in your

private life, you are a loving father, and son, and significant

other.  I consider those traits also in determining the just

sentence.  In particular, I have read with interest the letter

from your two sisters, from your mother, and from your

stepfather.  Your sister, Escrawlina, describes you as a very

good brother, and she says she wishes you could be home to be

with your baby girl.  Your sister, Eswilda, says that you have

always been her right hand and her rock and describes you as

the happiness of our family.  Your stepfather, Raphael Medina,

although not apparently aware of your crimes, describes you as

very good and very respectful, and your mother is similarly

complimentary of you and says he has a wife and two-year-old

1    daughter who are waiting for him.  I consider those

2    testimonials to you and the implicit testimonials in those

3    letters in your favor at the time of sentence.

4         The defense has asked me to impose a 120-month

5    sentence here.  I cannot agree with that at all.  The conduct

6    here, particularly the participation in the Avila-Gomez robbery

7    and ultimately felony murder, and also the two other assaults

8    are simply too wrongful to justify a sentence of that length.

9    From the Section 3553(a) perspective of general deterrence and

10   also as a matter of just punishment, I believe a longer

11   sentence than that is needed.

12        The interest of incapacitation, in my judgment, in

13   particular requires a much longer sentence.  It's important

14   that by the time you are released from prison, you be at an age

15   when it can be said either that you are more mature and less

16   likely to capitulate to join gang violence or that you will

17   have passed out of the age range where you are likely to be

18   recruited into a gang.

19        The government, for its part, has asked for a

20   guideline sentence, meaning at least 210 months in prison.  I

21   have carefully considered whether a sentence of that length is

22   necessary here or whether, particularly given the limitations

23   chronicled in Dr. Shea's very articulate and convincing report,

24   a somewhat shorter sentence is sufficient.  I think the

25   government's position is a reasonable one.  The issue is

1    whether the interests of Section 3553(a) can also be met by a

2    lower sentence.

3              In considering that question, I have also examined

4    sentences of other defendants in this case who have played

5    secondary or support, but also important roles in murders or

6    attempted murders and also participated in other acts of

7    violence.  I do so because I understand Section 3553(a) to

8    direct me to treat like offenders alike.

9              Considering all these factors, I believe a sentence

10   somewhat below the guideline range, but not dramatically below

11   it at all, is appropriate here.  Such a sentence would fairly

12   achieve the purposes of sentencing as reflected within Section

13   3553(a) while not being any longer than necessary to do so.

14   The sentence I impose, therefore, will reflect a very modest

15   downward variance.

16             I'm now going to state the sentence I intend to

17   impose.  The attorneys will have a final opportunity to make

18   legal objections before the sentence is finally imposed.

19             Mr. Strong, would you please rise.  Will you please

20   stand up.

21             After assessing in detail the particular facts of this

22   case and the factors under Section 3553(a), including the

23   sentencing guidelines, it is the judgment of the Court that you

24   are to serve a sentence of 192 months' imprisonment, or 16

25   years, in the custody of the Bureau of Prisons, to be followed

F2PKSTRS                        Sentence

1    by a period of three years' supervised release.  I will

2    recommend to the Bureau of Prisons that it provide Mr. Strong

3    with access to any mental health programs and treatment for

4    which he is determined to be eligible.

5         As to supervised release, the standard conditions of

6    supervised release shall apply.  In addition, you will be

7    subject to the following mandatory conditions:  You shall not

8    commit another federal, state, or local crime; you shall not

9    illegally possess a controlled substance; you shall not possess

10   a firearm or destructive device; I'm going to suspend the

11   mandatory drug testing condition due to my imposition of a

12   special condition requiring drug treatment and testing; and you

13   shall cooperate in the collection of DNA as directed by the

14   probation officer.

15        You must also meet the following special conditions

16   which are the ones set out on page 36 of the presentence

17   report, and I've given considered attention given the nature of

18   this case and of the Trinitarios gang to these conditions, and

19   I find them all merited.  In brief, you are to participate in a

20   drug and alcohol testing approved by the United States

21   Probation Office; you shall participate in a mental health

22   program approved by the same probation office; you shall submit

23   your person, residence, place of business, vehicle, or other

24   premises under your control to a search on the premise that the

25   probation officer has a reasonable basis for belief that

1   contraband or evidence of a violation of the conditions of

2   release may be found; you shall provide the probation office

3   with access to any requested financial information; and you are

4   to report to the nearest probation office within 72 hours of

5   release from custody.

6           I'm also ordering that you pay to the United States a

7   special assessment of $100 which shall be due immediately.

8           I have the legal authority to impose a fine.  I'm not

9   going to do so.  I'm persuaded that you don't have the ability

10  to pay it.  The government is not seeking forfeiture or

11  restitution, and I will not order that.

12          Does either counsel know of any legal reason why this

13  sentence should not be imposed as stated?

14          MR. SMITH:  No, your Honor.

15          MR. NKRUMAH:  No, your Honor.

16          THE COURT:  All right.  The sentence, as stated, is

17  imposed.

18          Mr. Smith, are there any open counts?

19          MR. SMITH:  There are, and we ask that they be

20  dismissed.

21          THE COURT:  Okay.  I will dismiss those counts.

22          Mr. Strong, to the extent you haven't already given up

23  your right to appeal your conviction and your sentence as a

24  result of your guilty plea and the plea agreement you've

25  entered into with the government, you have the right to appeal

F2PKSTRS                         Sentence

1    your conviction and your sentence.  If you're unable to pay for

2    the costs of an appeal, you may apply for leave to appeal

3    in forma pauperis.  The notice of appeal must be filed within

4    14 days of the judgment of conviction.

5            Mr. Nkrumah, is there a recommendation you'd like me

6    to make to the Bureau of Prisons with respect to where the

7    defendant is assigned?

8            MR. NKRUMAH:  Yes, I would, your Honor.  I would ask

9    that this Court recommend to the Bureau of Prisons that

10   Mr. Strong be housed in the facilities that can facilitate

11   visitation by his family in the Northeast corridor of the

12   country.

13           THE COURT:  I will recommend that he be assigned to a

14   facility as close as possible to the New York area.  I take it

15   that's what you're seeking to accomplish?

16           MR. NKRUMAH:  Yes, your Honor.

17           THE COURT:  Very good.  I'll be glad to do that.

18           Is there anything else from the government?

19           MR. SMITH:  No, your Honor.

20           THE COURT:  Anything from the defense?

21           MR. NKRUMAH:  No, your Honor.

22           THE COURT:  Let me just ask you to be seated.  I want

23   to say a word or two to Mr. Strong's family.

24           Ladies and gentlemen, I can see your faces, and I can

25   see the heartache on them.  I want to just say this to you:  I

F2PKSTRS                      Sentence

1    read the letters that you submitted for Mr. Strong on his

2    behalf.  They gave me an insight into him.  They reinforced

3    some of the themes that Mr. Nkrumah stated in his letter, and

4    they were helpful and influential to me getting a better, more

5    rounded sense of who Miguel Strong is.

6            I also want to thank and acknowledge you for being

7    here today.  I can see how hard a day this is for you.  Your

8    being here today, as well as on February 3rd when we initially

9    started the sentencing proceeding, says to me that you're going

10   to be here for Mr. Strong throughout the long term while he's

11   in prison, and, most of all, when he comes out.  That's when

12   he's going to need you most of all.  There have been moments in

13   his life when people have not been there for him.  The fact

14   that you're here now tells me that you will be here for him in

15   the long term when he needs you most, and that's encouraging to

16   me.

17           With appreciation for how hard a day this is, I thank

18   you for being here.  We stand adjourned.

19                              * * *

20

21

22

23

24

25